FUCHS, *Appellant*, v. ST. LOUIS *et al.*

In Banc, March 3, 1896.

1. **Municipal Corporation**: PUBLIC SEWER: NEGLIGENCE.  A public sewer of the city of St. Louis exploded and killed the husband of plaintiff, who was in a building under which the sewer ran.  The explosion occurred on the fourth day after a large fire at certain oil works.  During the fire, a quantity of coal oil escaped from the works and was allowed to run into the sewer through improvised drains, made under directions of the chief of the city fire department.  The time was summer.  The outlet of the sewer was obstructed by a high stage of water in the river into which the sewer emptied.  The coverings of direct openings into the open air from the sewer near the point of the explosion were not removed after the fire, nor were

Fuchs v. St. Louis.

any other measures taken by the city to avoid the catastrophe. It might be inferred that the explosion was caused by gas generated in the sewer after the fire. In an action against the city and the company owning the oil works, it was *held*, in the circumstances stated in the opinion, that there was evidence of negligence on the part of the city, but none as to the oil company.

2. ——: ——: ——. A city is liable for damage resulting from the negligent management of its public sewers.

3. ——: ——: ——. An explosion of a sewer underneath residence property is itself entitled to be considered as warranting an inference of some negligence. *Res ipsa loquitur.*

4. ——: ——: ——: NOTICE. Notice of facts may be inferred from lapse of time when they are of such a nature as to attract general public attention.

5. **Ordinary Care.** Ordinary care depends on the facts and circumstances of each case. It is often an essential part of that care to guard against such occurrences as persons of ordinary prudence would reasonably anticipate in a given situation.

6. **Negligence, Question of Fact, When.** Where evidence fairly warrants an inference of negligence, it is for the triers of fact to find whether or not there was such negligence.

7. **Scientific Facts:** JUDICIAL NOTICE. Courts take judicial notice of the scientific fact that gases form from volatile oils, upon subjection of the latter to heat.

PER SHERWOOD, J., DISSENTING.

1. **Municipal Corporation:** LICENSE TO CONSTRUCT SEWER: DUTY TO KEEP SEWER IN GOOD ORDER: CONTRACT: EXPLOSION: DAMAGES. Where there is no evidence that a city, in consideration of a license to construct a sewer under a lot, contracted with the owner of the lot and his assigns that it would keep the sewer in good order, so that the lot and any improvements that might be put thereon would be free from danger of injury on account of the sewer and the use thereof, no right arises out of contract that would render the city liable for injury to person or property by an explosion of gases in the sewer. (Per SHERWOOD, J.; BURGESS and ROBINSON, JJ., concurring.)

2. ——: ——: ——: PLEADING: NEGLIGENCE. A petition in an action against a city for the death of plaintiff's husband, caused by the explosion of noxious gases in a sewer of the city, which fails to allege that it was the duty of the city to keep the sewer free from noxious or dangerous gases or from fluids and substances that would generate such gases, states no negligence and no cause of action. *Ib.*

Fuchs v. St. Louis.

3. **Practice**: PLEADING: APPEAL. The failure of a petition to state a cause of action may be taken advantage of in the trial court by objecting to the introduction of evidence, or the point may be raised for the first time in the appellate court. *I b.*

4. **Municipal Corporation**: SEWER: EXPLOSION: PRACTICE: DE· MURRER. Where an explosion in a sewer causing the damage complained of is alleged to have been caused by gases produced from oils allowed to flow into the sewer, which gases were not permitted to escape, and the evidence showed that the oils escaping into the sewer did not produce gas at ordinary temperature, and the temperature of the sewer was not shown, a demurrer to the evidence was properly sustained. *I b.*

5. **Pleading**: PRACTICE: VARIANCE. Where gases are alleged as the cause of an explosion it can not be shown that it was caused by vapors. *I b.*

6. **Damages**: PRACTICE: EVIDENCE. Where an action is brought for damages which are caused by one of two things, for one of which defendant is responsible and for the other he is not, the plaintiff can not recover where he fails to show that the damages were produced by the former, or where it appears from the evidence that the probabilities are equally strong that the damages were caused by the one as by the other. *I b.*

7. **City**: EXPLOSION IN SEWER: PLEADING: PRACTICE. Where, in an action for damages alleged to have been caused by the explosion of gas in a sewer, it being charged that the gas was formed from oil that flowed into the sewer, the evidence showed that the conditions in the sewer were favorable to the formation of marsh gas by the decomposition of vegetable matter under water, or of sulphuretted hydrogen from the putrefaction of both animal and vegetable matter, and it is not shown whether the explosion was caused by the former or by either of the last two or a mixture of them, the plaintiff can not recover. *I b.*

8. **Negligence**: PLEADING: PRACTICE: EVIDENCE. Where a particular act of negligence is specified as a cause of action, evidence will not be received to support a general allegation of negligence, but the plaintiff will be confined to the act of negligence specifically assigned. *I b.*

9. ———: BURDEN OF PROOF. In an action for damages caused by negligence, the burden is on the plaintiff to establish by the evidence circumstances from which it may fairly be inferred that there is a reasonable probability that the damage resulted from the want of some precaution to which the defendant might and ought to have resorted, and, where there is no attempt to make such proof, the plaintiff can not recover. *I b.*

10. ———. It is not negligence to omit a precaution which, if taken, would have prevented an injury, when the injury could not reasonably have been anticipated, and would not, unless in exceptional circumstances, have happened. *I b.*

11. **Municipal Corporation:** PUBLIC DUTY: SEWER: NEGLIGENCE: DAMAGES. A city is, in the construction and maintenance of a sewer, engaged in the performance of a public sanitary duty for the public good, and not for its own private advantage or emolument, and, in such case, is not liable in damages for the wrongful or negligent acts of its officers and servants, unless made so by positive law or by inevitable implication. *I b.*

12. **Negligence:** DAMAGES. An oil company can not be held liable for damages resulting from the turning of oils, running from its premises at the time of a fire, into a sewer, because it did not forbid the oils which ran into the streets and on the railroad tracks from being turned, by means of trenches, into the sewer, nor use force to prevent it from being done. *I b.*

*Appeal from St. Louis City Circuit Court.*—HON. D. D. FISHER, Judge.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

*Lubke & Muench* for appellant.

(1) The Waters–Pierce Oil Company was properly joined as a defendant with the city under section 9, of article 15, of the scheme and charter (R. S. 1889, p. 2143). It is there provided that whenever the city is jointly liable for a tortious act with another party who resides in this state that then such other party shall be made a codefendant. And it is provided, further, that if "it is made to appear that any person or corporation ought to be joined as a defendant in the suit according to the provisions of this section," and has not been so joined then "the plaintiff shall be nonsuited." This charter provision is valid. *Donoho v. Iron Works*, 75 Mo. 401. (2) The state has recognized the business of handling petroleum and its products to be dangerous

to human life and has put it under regulation by providing for the appointment of inspectors, commonly known as coal oil inspectors. These officials are required to give bond. The act declares certain things in connection with the business if done to be criminal and also declares penalties against the offenders. And for a neglect of duty by an inspector any party aggrieved is entitled to sue upon the inspector's official bond. R. S. 1889, chap. 87, p. 1323; *County Court to use v. Fassett*, 65 Mo. 418. (3) When the safety of human life is in question a high degree of care is required in conducting a business in itself lawful. And when in that business pipes are used to carry oil, there is a constant duty of inspection so that the pipes may be kept in proper condition. *Lee v. Oil Co.*, 54 Hun, 157. (4.) The chief of the fire department is an officer of the city designated by the charter and is the agent of the city in all matters connected with his department including the inspection of all buildings which are in the course of construction. He was bound to take notice of the dangerous character of petroleum and its products. The statute of the state regulating its sale alone gave him warning because he was bound to take notice of the public statutes of the state. Art. 11 of scheme and charter, R. S. 1889, p. 2134. (5) The evidence showed that the sewer in question was maintained by the city in part for private purposes of its own,—that of draining the city hall, the Four Courts, and the jail. The case at bar, therefore, falls within the rule that the municipality is liable like any individual for the negligent use of its property. The city is liable for injuries inflicted by the fall of a market house if it was not built strong enough to withstand ordinary storms. *Flori v. City*, 3 Mo. App. 231; 69 Mo. 341. Where a person was injured at a trap door in the sidewalk of a police station the city was held liable on the ground

that it was bound to keep its sidewalk in a reasonably safe condition and also on the ground that the police station was its own property. *Carrington v. City*, 89 Mo. 212. (6) The duty of a city to keep its sewers in proper condition is a ministerial one and for its breach an action will lie at the instance of the injured party. 2 Dillon on Municipal Corporations [3 Ed.], sec. 1049, and cases cited. (7) If the sewer is negligently permitted to become obstructed or filled up so that it causes the water to back flow and fill up cellars connected with it the city will be liable to the parties injured. 2 Dillon Municipal Corporations [2 Ed.], sec. 1049. (8) A city is liable to the injured party for a back flow of water from a sewer which the city has failed to keep unobstructed. Its duty in this regard is ministerial. *Thurston v. St. Joseph*, 51 Mo. 510. (9) There was sufficient evidence to connect the Waters-Pierce Oil Company as a principal with the wrong here complained of. That company owned the dangerous article and knew it was being carried off into the sewer for the better protection and preservation of the company's other property. It received directly the benefit of the wrong done and is a joint tortfeasor with the city. Cooley on Torts [1 Ed.], p. 127, 136; *Canifex v. Chapman*, 7 Mo. 175; *Page v. Freeman*, 19 Mo. 421; *Allred v. Bray*, 41 Mo. 484; *McManus v. Lee*, 43 Mo. 206; *Murphy v. Wilson*, 44 Mo. 313.

*W. C. Marshall* for the city of St. Louis, respondent.

(1) Under the pleadings and evidence the plaintiff was properly nonsuited. The evidence fails to show any act of commissive or omissive negligence on the part of the city. (2) "The rule of law is well settled that a municipal corporation is not liable in damages

for the wrongful or negligent acts of its police or other officers in the execution of powers conferred upon the corporation or officers for the public good, and not for private corporate advantage, unless made liable by statute law, expressly or by implication. *Armstrong v. Brunswick*, 79 Mo. 319; *Kiley v. City of Kansas*, 87 Mo. 103; Dill. Mun. Corp. [3 Ed.], sec. 975; *Murtaugh v. St. Louis*, 44 Mo. 479." *Carrington v. St. Louis*, 89 Mo. 212. A sewer is constructed for the sanitary benefit of the whole people, and not for private corporate advantage, and the acts of the officers of the city in charge of the construction or maintenance of a sewer can not cast a liability on the city. If such was the result of the establishment and maintenance of sewers, no city could afford sanitary protection to its inhabitants at such a price. (3) The case at bar comes rather within the doctrines announced by this court in *Heller v. Sedalia*, 53 Mo. 159, and by the court of appeals, in *McKenna v. St. Louis*, 6 Mo. App. 320. (4) The establishment of sewers is exclusively for the promotion of the sanitary condition and health of the inhabitants, and is as much a governmental function as the establishment of a police force for the protection of life and property or the establishment of a fire department for the protection of property.

*C. P. & J. D. Johnson* for Waters–Pierce Oil Company, respondent.

(1) The instruction for a nonsuit in favor of the Waters–Pierce Oil Company was correct, because: *First.* There was no evidence that it was guilty of the negligence charged in the petition. *Hudson v. Railroad*, 115 Mo. 127; *Sira v. Railroad*, 85 Pa. St. 293; s. c., 27 Am. Rep. 653, and cases cited; *Railroad v. Lock*,

112 Ind. 404; Cooley on Torts [2 Ed.], p. 73. *Second.* It does not appear that the oil which was run into the sewer occasioned the explosion. (2) Section 9, of article 15, of the charter of the city of St. Louis, does not change the practice act with respect to nonsuits, in cases brought against the city and another thereunder, as contended for by appellant.

### DIVISION ONE.

Barclay, J.—This action was brought under the damage act (R. S. 1889, chap. 49, secs. 4426, 4427) to recover for the death of Mr. Carl E. Fuchs. Plaintiff is his widow and charges that his death was occasioned by the wrongful act or neglect of the defendants, which charge the defendants deny. The defendants are the city of St. Louis and the Waters–Pierce Oil Company.

The case came to trial in the circuit court, in St. Louis. At the close of the testimony instructions were given to the effect that plaintiff could not recover against either defendant. Plaintiff took a nonsuit with leave, etc., and, having, without result, duly moved to set it aside, brought the case here by appeal, after the customary exceptions preserving her case for review.

The plaintiff's husband was killed by the explosion of a public sewer which was in the possession and control of the city. The question presented by this appeal is whether the facts tend to show a liability for that misfortune, as to either one of the defendants.

Mr. Fuchs had for many years owned a building on the east side of Fourth street between Chouteau avenue and Convent street. In July, 1892, he occupied the lower floor and cellar of this building as a place of business, where he conducted a saloon. The house

stood over a public sewer, built by the city, before he acquired the property in 1884. The house was built in that year.

The sewer was called the "Mill Creek Sewer." It was a large one, maintained by the city. It was used to drain an extensive territory, as well as to carry off the surface water and sewage from the public buildings in the central part of the city, including the City Hall, the "Four Courts," and the jail. The sewer extended from the west beneath and across Broadway (or Fifth street) and Fourth street, underneath and across Mr. Fuchs' lot, and thence eastwardly, a distance of about four blocks, to the Mississippi river, its outlet. The sewer was provided with several closely covered openings or manholes, which were available for ventilating it. Several of these manholes were located along the line of the sewer near the saloon property, one of them a short distance west of it. The sewer was about fourteen feet in diameter, had an arched top, and was built chiefly of masonry.

July 22nd, 1892, about noon, a fire broke out on the premises of the Waters-Pierce Oil Company, located some ten blocks west, and two or three blocks north, of the saloon. While the fire was in progress, and the city fire engines were throwing streams of water on the burning buildings, large quantities of oil and water ran from the premises of the Oil Company, and spread out among the railroad tracks adjoining. Then a gang of laborers, under direction of the Chief of the St. Louis Fire Department, dug a trench among the railroad tracks and by that means conducted the oil and water into a drain leading to the Mill Creek sewer. This oil was not burning at the time. The men who did this were not on the premises of the Oil Company, and no officer of that company present was seen or

heard to give them any directions concerning the prosecution of the work, nor was it shown that the workmen were in the employ of the Oil Company. Nor was the sewer inlet, into which this oil was conducted, on the premises of the Oil Company. How much oil ran into the sewer does not clearly appear. But the amount was, at least, three or four hundred gallons.

Four days after the fire the explosion occurred, shortly after 4 P. M. The immediate cause was the act of an employe of a shop (not far from the saloon) who went into a cellar in the course of his business, taking a lighted candle. As he approached the drain or sewer inlet, there was a puff of flame and an explosion which knocked him off his feet, stunned him and set fire to his clothes. He remembered nothing more for sometime thereafter; but another man near him took up the story at that point and testified that the big explosion (which demolished part of the saloon) occurred before you could count ten, after the mishap to the man with the candle. The final explosion made a noise like a cannon, as one witness described it. It tore open the top of the sewer for a long distance, blew out part of the saloon building, and killed the plaintiff's husband.

The drain opening into the cellar where the explosion originated connected with the Mill Creek sewer.

The presence of a large body of oil in the sewer at the time and place of the catastrophe was established by the testimony of a witness who was sitting at a table in the saloon with Mr. Fuchs when the explosion took place. This witness, an old riverman, was thrown into the sewer and struggled and swam in it a distance of several hundred feet, but was fortunate enough to

escape alive. His positive evidence showed the presence of much coal oil gas in the sewer while he was in it.

There was evidence that the conflagration at the oil works was large and attracted general public attention.

A "gas engineer," of many years' experience in manufacturing gases from petroleum and its products, testified for plaintiff that crude petroleum, exposed to a temperature of sixty degrees Fahrenheit, in a confined space, gives off inflammable vapors or gases which will explode when brought into contact with flame; that naphtha is one of the first products of the distillation of crude petroleum and is lighter, and the like vapors will form from it speedier than from crude oil in the same temperature; that these vapors or gases are lighter than the air and rise, and, although not combustible spontaneously, will explode so soon as a flame comes in contact at any point with the gas.

The evidence also indicated that the outlet of the sewer at the river was stopped up, by reason of the high stage of water.

There was evidence to show that some of the large manholes or inlets to this sewer in the vicinity of the saloon were not opened after the oil ran into the sewer; and that the cover of a manhole in the street west of the saloon was thrown into the air by the explosion, and broken in pieces.

The death of the plaintiff's husband occurred, July 26th, 1892, the day of the disaster, and this suit was instituted on September 16th following.

1. The first question is whether the case should have gone to the jury on the issue of negligence on the part of the city.

Irrespective of any inquiry as to the capacity or

construction of the sewer, it is settled law in Missouri that a city is liable for any omission of reasonable or ordinary care in the management of such a property. What is ordinary care depends very greatly on the facts and circumstances of each particular case. In determining what care of property is reasonable, its situation and the objects of its use should be considered.

Here was a large sewer which ran under business buildings in a populous part of the city, and the sewer exploded in the circumstances described.

There is not, by the way, the slightest claim or suggestion of any negligence on the part of the deceased.

That a large body of inflammable oil had entered the sewer, because of the fire at the oil works, was a fact which the jury might naturally have inferred the city had notice of, after a lapse of four days, as also of the high water in the Mississippi river at that time, preventing a free discharge of the contents of the sewer in that direction.

The fact that gases form from such oils, upon subjection of the latter to heat, is a matter of ordinary scientific knowledge, of which courts will take judicial notice. It was moreover testified to as a fact in the case before us.

In view of the conditions existing at the time of the disaster, what was the duty of the city; or, rather, what fair inferences may be drawn (from the fact of the explosion and its circumstances) as to the performance or nonperformance by the city of the duty of ordinary care toward its citizens living along the line of the sewer?

It is in evidence that the large vent or manhole in the street, just west of the saloon, was tightly covered during the four days from the fire to the explosion, and that when the latter occurred the iron cover of that

opening, about three feet in diameter, was thrown a great distance by the force of the shock.

The time was summer—the latter part of July. Yet nothing whatever appears to have been done by the city authorities, so far as this evidence indicates, toward averting the effects likely to follow the escape of such a large body of volatile oils into a sewer whose natural outlet was obstructed by the high water in the river, as stated.

All the facts which made the sewer dangerous might fairly have been found to be within the knowledge of the city officials, after the lapse of time following the fire. *Vanderslice v. Philadelphia* (1883) 103 Pa. St. 102.

Carefully managed sewers do not, according to the common experience of men, usually blow up and scatter destruction and death. Such a performance is of itself entitled to consideration, on the issue of care in respect of such property; or as some jurists have said, "The thing itself speaks." *Byrne v. Boadle* (1863) 2 H. & C. 722; *Koelsch v. Phila. Co.* (1893) 152 Pa. St. 355 (25 Atl. Rep. 522); *Judson v. Giant Powder Co.* (1895) 107 Calif. 549 (29 L. R. A. 718, 40 Pac. Rep. 1020); *Sheridan v. Foley* (1895) (N. J. L.) 33 Atl. Rep. 484.

Had the cover of the large opening west of the saloon been removed, so as to allow the direct escape of the gas at that point, it may be that the disaster would have been avoided. It was not removed; nor do any steps appear to have been taken in regard to the care of the sewer by the city authorities after the flow of the oil into it on the 22d of July.

It is not always consistent with common prudence to await a catastrophe before taking precautions against it. Nor is it conclusive of careful management that a particular disaster has never before occurred.

It is often an essential part of reasonable care to guard against those performances which men of ordinary prudence would naturally and reasonably anticipate in dealing with such dangerous agencies as science has contributed to our complex civilization. To what extent such foresight is demanded by the duty to use ordinary care it would be very difficult to say. We shall not attempt to generalize on that topic now. And as the cause at bar should be brought to another trial, we do not propose to go into any further comment on the facts than seems needful to indicate our general view as to their probative force and tendency.

It appears to us, on the testimony submitted, that it can not be declared as a conclusion of law that the city fully performed the full measure of its duty in respect of the sewer property; and hence that the learned trial judge erred in giving the instruction which denied plaintiff the right to go to the jury for a finding of fact as to the alleged negligence of the city. *Lee v. Vacuum Oil Co.* (1889) 54 Hun 156.

2.  Touching the charge against the Oil Company, there is no evidence as to the origin of the fire at the works, nor any evidence of any want of care on the part of the company in regard to the flow of oil into the sewer. That flow was caused by the direction of the chief of the city fire department for the purpose of averting the danger of spreading the conflagration. The Oil Company was not responsible for that action on the facts shown, nor was it responsible for the care of the public sewer which exploded four days later.

We conclude that the ruling and finding as to the Oil Company should be affirmed; but as to the city the judgment is reversed and the cause remanded for a new trial. BRACE, C. J., and ROBINSON, J., concur. MACAFRLANE, J., concurs in the result.

IN BANC.

PER CURIAM.—The foregoing opinion of BARCLAY, J., handed down in Division No. 1, is adopted as the opinion of the Court in Banc. BRACE, C. J., GANTT, and MACFARLANE, JJ., concurring therein with him, SHERWOOD, BURGESS, and ROBINSON, JJ., dissenting. Accordingly the judgment of the circuit court is affirmed as to the Waters–Pierce Oil Company, and is reversed and remanded for new trial as to the city of St. Louis.

SHERWOOD, J. (*dissenting*).—Action by plaintiff, the widow of Carl E. Fuchs, deceased, to recover damages for the death of her husband, caused by the explosion of "Mill Creek Sewer."

The petition after formal and preliminary statements alleges that the defendant city had built the sewer, and then proceeds to state that a fire broke out on the premises of defendant the Waters–Pierce Oil Company on the twenty-second of July, 1892, where a large stock of oils was stored by that company, and that such company did cause and permit said oils to escape and run into the above mentioned sewer, fill the same with oil, and generate gases therein, etc.

Having made these allegations, the petition then avers that: "Under a license from the then owners of said lot (referring to the lot afterward bought by Carl E. Fuchs in May, 1884) the said sewer was by said city constructed and carried underneath said lot eastwardly toward the said river, and that said sewer was located below the cellar afterward caused to be built upon said lot by said deceased Carl E. Fuchs; that when defendant, the city of St. Louis, obtained said license from said owners, it assumed and agreed with the then owners of said lot and their assigns and became bound to keep and maintain said sewer in good order and to care for the said sewer, so that said lot and any im-

provements which might be put thereon would be free from danger of injury on account of said sewer and the use thereof.''

The petition then concludes thus: ''Plaintiff further alleges that said sewer was provided with openings especially designed to carry off any gases which might arise in said sewer and be liable to combustion and explosion and that said sewer and the openings thereof aforesaid on and prior to the said twenty-sixth day of July, 1892, were in the sole care and control of defendant, the city of St. Louis, its agents and servants, yet the said city, its agents and servants, knowing that said defendant, the Waters–Pierce Oil Company, had flooded said sewer with oil, neglected to open said vents and carelessly and negligently failed to take measures and precautions to prevent gases arising and accumulating in said sewer so as to endanger the same; and that between the said twenty-second and twenty-sixth days of July, 1892, gases did arise and accumulate in said sewer in great and very dangerous quantities and on the date last named, and within six months next before the commencement of this suit, ignited and exploded with great force, throwing open said sewer underneath the property of said Carl E. Fuchs, shattering his said building, and also then and there causing the death of said Carl E. Fuchs,'' etc., etc.

The answer was a general denial by defendant city as well as by defendant company.

The evidence in substance, so far as necessary to state it, was to this effect: Carl E. Fuchs, deceased, owned the building on the east side of Fourth street, seven or eight doors south of Chouteau avenue and about four blocks from the river. This section of the city is a valley and the sewer in question is known as ''Mill Creek Sewer.'' This sewer was formerly a creek

and constituted the natural drainage of a large portion of the city, into which very numerous smaller sewers emptied, and it drained the property in Mill Creek valley from Grand avenue eastwardly, and also drained the city hall and Four Courts. Fuchs' building was located over this sewer, which was built in 1858 or 1859 in the most solid and substantial manner, the stones composing it being very massive, and it ran through the lot on which the store building of Fuchs was situate, in a northwesterly and southeasterly direction, and crossed Fourth street and Broadway, which converged at that point, and were in consequence of such convergence, some two hundred or three hundred feet wide at that point.

On July 26, 1892, the sewer exploded about 4:25 P. M. and in consequence of which, Carl E. Fuchs died on that day. The explosion tore out the front of the store except the iron pillars, also the rear wall of the entire building and the floor of the store; and opened the sewer through the whole length of the building and extended eastwardly between Second and Main streets, where the entire top arch of the sewer was thrown out for a distance of about four hundred or five hundred feet. The street west of the store was not disturbed, but the sidewalk on the west side of Broadway was torn up and also the property next to it. There were covers for the sewer in the middle of the street (where Broadway and Fourth street join) opposite the store, and another on the west side of Broadway about one hundred and fifty feet from the store; this cover was blown off. The one in the street west of the store was an ordinary size manhole, three feet in diameter, with a solid cast-iron lid about three fourths of an inch thick; after the explosion this lid was found broken in pieces, and the contents of the store—barrels, boxes, bottles, shelving and woodwork, wood floors, joists,

plaster, and wainscoting—were in the sewer through which the water was rushing. There was a substance in the cellar which looked like an oily mass and had a gaseous smell.

The Waters–Pierce Oil Company's place of business was between Gratiot street on the south, Twelfth street on the east, the railroad tracks on the north, and Fourteenth street on the west, and was ten blocks and two or three stores north of the Fuchs store, and was close to the "Mill Creek Sewer," where the company had large iron tanks for storing oils, from which they filled sheet-iron wagons for distributing oils to retail dealers in the city, etc., etc.

The floor of the cellar of the Fuchs house was composed of a layer of two or three inches of cinders with a cement top constructed on the arch of the sewer. The sewer was fourteen feet wide, twelve feet high and with walls twenty to twenty-four inches thick. At the time of the explosion the river was very high and filled the cellars and first floors of the buildings on the levee. A fire occurred at the defendant company's works on July 22, four days prior to the explosion. The witness giving the foregoing testimony, was Dr. Fuchs, a son of the deceased.

On his cross-examination this witness stated: Generally ordinary sewage is dark and greasy looking; that he could not tell whether any petroleum oil was mixed with the water in the sewer, but that it had an odor like gas, not like ordinary lighting gas, but a greasy smell like petroleum or gasoline, something like that, though he was not sufficiently versed in chemistry to tell what kind it was; that the smell was not like that emanating from the black liquid which he had seen taken from sewers; that the smell was different from the ordinary gases from the gas works; that the manhole at the intersection of Broadway and Fourth

street was about one hundred to one hundred and fifty feet west of the store; that he knew of no manholes in the sewer east of Fourth street; that after the explosion he saw flat cars which had fallen into the opening of the sewer which was constructed under the property before his father bought it, or built on it, and since that time no repairs on the sewer east of Broadway had been necessary; that there was a slight current to the water in the sewer, the day of the accident, but the mouth of the sewer was blocked up by the river; that there was only one sewer inlet at the north end of Market at the junction of Fourth and Fifth streets, and one at the southwest corner of Broadway and Chouteau avenue, that the one at the north end of the Market was reconstructed, and it was made of clay pipe with a goose neck to it, to prevent the escape of gases into the open air; this was done at the instance of the people in the neighborhood who complained of the gases and odors thus escaping; that the inlet at the corner of Chouteau avenue and Broadway is intended to drain the surface water from the streets.

Follenius, whose marble works were located at 508 and 510 Chouteau avenue, and who had occupied those premises for about twenty-two years, and who had been familiar with the locality for some twenty-eight years, testified that he remembered the fire which occurred at the oil company's works on Thursday the twenty-second of July. There was a manhole at the corner of Broadway and Chouteau avenue on the west side of the latter. That on Sunday (next before the Monday the twenty-sixth of July) on which the explosion occurred, his place having connection with the sewer, he observed a peculiar smell from the sewer; that it seemed as though mixed with sewer gas and coal oil, which was different from the sewer gas smells which were there most all the time; that he was seated

at his desk when the explosion occurred, and after that went out into his yard which looked as if it had been plowed up with a large plow; that large holes were blown in the top of the sewer three or four feet over, from which issued an odor like he had noticed the day before; that the shock threw the lid off the manhole at the corner and on going eastward he noticed the same kind of odor issuing at the southeast corner of Broadway and Chouteau avenue, also east of the Fuchs building, and that the smell was unlike coal gas and different from any smell that had come from the sewer before; that the odors that came from the manhole at the southeast corner of Broadway and Chouteau, were there before the sewer was built, but since its building could only be detected on a cloudy, rainy day. He further testified that he saw a colored mass mixed with the dirty water that was flowing down the sewer, of a kind of violet color, but could not say whether it was oil.

Tunstal, another witness, was in the back room of the building when the explosion took place, and Fuchs and Kriebaum were in there with him, and by that explosion he was cast into the sewer, and from which he got out after struggling in the stream a distance of about eight hundred feet; there he encountered water from five to six or seven or eight feet deep; that in the sewer were "sawdust and muck, and petroleum and coal oil, and everything else that you could think of that was nasty;" there was a little current, enough to carry him along, but none right where the debris from the house dammed up the sewer; that there was a large amount of sawdust in solution and general muck, more like molasses or tar, or something of that kind; that petroleum is a thick fluid like tar; and that there was coal oil on top of the water; this he recognized in the darkness of the sewer; that there was *"gas either from petroleum or whatever it was that blew up the sewer;"*

"that the explosion didn't ignite *all* the gas in the sewer; that there were other odors there besides that of gas; that witness was compelled to hold his nose and get under the water to keep from being asphyxiated with gas, which was just like needles going up into his nose;" that the defendant oil company's works were located along side of the Mill Creek sewer, between Twelfth and Fourteenth streets on the Pacific railroad, and this was the only oil mill on that sewer.

Two hours after the occurrence of the explosion, another witness, Dr. Bowler, who was in the second story of the Fuchs building when it occurred, states that a characteristic pungent smell was noticeable arising from the opening in the sewer, such as usually arises from sewers; that after the explosion there was smoke or vapor arising from the sewer indicating that there had been fire or combustion in the sewer and that the gas had been consumed; that the ordinary gas which accumulates in sewers from decaying vegetable matter is explosive when ignited under certain conditions; that the density of the gas would have to be sufficient and also sufficient heat to produce the explosion; that if all the conditions were favorable you would get spontaneous combustion or explosion by ignition, that is, applying a light to the accumulated gas; that sewer gas may explode under certain conditions without the presence of petroleum; that he understood the process of manufacturing gas from crude petroleum, which, and coal oil, are explosive when subject to a certain degree of heat, and that under favorable conditions either of the gases mentioned might explode spontaneously.

Schneider, who lived in the next door south of Fuchs, testified that there were two manholes in the Mill Creek sewer at the junction of Fourth and Fifth

streets (the latter of which is usually called Broadway), one in the middle of the street and the other on the sidewalk on the west side of the street, and they were kept closed with solid covers; that there were two other openings to the sewer, one on the corner and one right in front of the Market, which were made for water to flow into, and two openings of usual size to the sewer also open, covered with grates in the alley, one hundred and forty-four feet east of the Fuchs property, right behind the property of witness; these openings in the alley are to a sewer connected with the main sewer; that on the evening of the day of the fire (which occurred just a little after noon) the smell from the sewer of coal oil was so strong in his house that they had to close the windows; that his sewer connects with the Mill Creek sewer; that each succeeding night it was the same way, and they could not stand it in the rear of the house and had to go to the front because of this smell of coal oil. There was always some odor coming from the sewer, but not so strong as at the time mentioned; that the odor was much stronger after the fire than before; that since the manholes on Fourth and Fifth streets had covered tops they did not suffer so much from the odor; that the branch sewers affording connection from his house with the Mill Creek sewer had no self-acting safety cocks to shut off odors from the sewer in the yard.

Kuntz, a plumber, testified that seven or eight years ago he connected the premises of the Waters-Pierce Oil Company with the Mill Creek sewer at a point on Gratiot street, opposite Thirteenth, to drain their yard; that there was a grating at the junction of Fourth and Fifth streets over the main sewer to let the water flow in.

Hartung, reporter, testified that he was present at the time the fire of the oil company's works occurred

and was there some three hours; that he saw men who wore overalls and were laborers, who were acting under the command of Lindsay, chief of the fire department, digging trenches in among the railroad tracks and thus conducting, the oil and water (which was in large quantities in the ground from five to twelve inches deep) to the public sewers; that these men at work were about fifteen feet north of the oil company's plant; that it was impossible to tell the proportions of the flowing water and oil; that the men were not firemen; that while the works of the oil company were furiously burning, the oil from the works ran out on the ground and among the railroad tracks on which the cars were standing; that he asked Chief Lindsay "whether there was any danger from that oil that was scattered among the tracks catching fire and damaging the railroad property, and he said, no, he thought not, that the men were leading it into those inlets, and I heard him say 'move along,' or 'is it hot,' and questions of that sort;" that there was no way to prevent the oil, etc., from escaping and going northward into the Union Depot yards where there were cars standing, except by turning it into the sewers; that the fire department was playing on the fire at the time the works were burning; that one of the officers of the defendant company stated to him that there was naptha in some of the company's tanks. This witness also testified that there were three hundred or four hundred gallons of oil flowed into the sewers, and then after that three thousand or four thousand gallons, and then said he could not estimate the quantity as he could not tell how thick the oil was on the surface of the water.

Wilson, a policeman, testified that just as he passed the Fuchs place the explosion occurred; that a dense smoke came out of the building which resembled the

scent which arises after the extinguishment of a gasoline stove.

Enger, a gas engineer, who had twenty-one years experience in making gas from petroleum and its products, had not studied the matter of how gases originate that are formed in a sewer; that gases arise by evaporation; they are not made that way, but are produced that way, by simple evaporation; that some of the constituents of the oil would evaporate; that this was the case with all kinds of oil from crude petroleum down to naptha, gasoline; that illuminating oil that is sold as kerosene would not give off any vapor under ordinary temperature, nor would it produce any gas; "I have tried that many times;" that if you poured such oil on the floor, with a lighted candle in the room, the oil would not take fire; that it only explodes or burns by contact; that crude petroleum gives off a vapor under ordinary temperature, that is, any temperature of over sixty degrees Fahrenheit, which is inflammable by coming in contact with fire; that it can not be called a *gas* but is a *vapor;* that if you filled a large vessel with crude petroleum and put it in a closed room, after a time, depending on the atmosphere, there would be gas enough in the room to make it dangerous to go in there with a light; that there would have to be a great deal of ventilation in a room to prevent it being dangerous. "I would be afraid of it even in any case;" that he had given the question of the construction of sewers in a city no attention; that naptha is one of the first products of distillation of petroleum and is a very light oil, and vapors form from it much quicker than they would from petroleum alone; that gasoline is the same as naptha, only a little lighter grade.

Asked whether sewer gas or marsh gas would not ignite or burn spontaneously, witness said that the

former would not, and that ordinary gas would not to his knowledge; that it would take a very large quantity of crude petroleum to generate enough vapor to cause Mill Creek sewer to explode; that when he spoke of oil evaporating at a temperature of sixty degrees, he referred to oil in an open vessel, such an one as would admit of air; that from his general reading he knew that there was a constant generation of gases from animal and vegetable matter, and was called sewer gas, which is a mixture of gases; that there is a mixture of sulphuretted hydrogen and may be some marsh gas; that marsh gas emanates from decaying vegetable matter; that witness believed it was common in sewers; that the conditions were favorable to it, and that the conditions were more favorable to sulphuretted hydrogen being in sewer gas and more so than ordinary marsh gas; that gas is generated in sewers from human excrements, rotting vegetables and animal matter; that explosions from sulphuretted hydrogen or marsh gas would be about the same in their violence as gas from petroleum vapors; that in the opinion of witness if the explosion had resulted from crude petroleum or other cause, such sudden ignition would have raised the temperature to about two thousand, two hundred degrees, and the heat would have ignited and burned any petroleum in the sewer at the time, and would have ignited the petroleum more readily on the surface of the water than if lying on a dry surface. This witness could not state what the temperature of the sewer was; that tank cars containing hundreds of barrels of oil are constantly being transported all over the country without any protection from the sun, and having on the top of each a cupola top with a manhole in it and by means of such holes the cars are filled.

Humpert, who did business for Peters at French Market, across the street from Fuchs' place, testified

that on the twenty-sixth of July he went down in the afternoon with a lighted candle to put some watermelons away in an ice chest in the cellar, when a cloud of fire came right in his face and knocked him on his knees, etc. This place was about one hundred and fifty feet from Fuchs' place; and that there was a sewer in the cellar which connected with that one in the alley; that there was a manhole in the alley over the sewer and is covered by a grate; this was just back of Peters' building.

Kern next testified that he was in front of Peters' place when the explosion happened, that he saw Humpert, who had just come from the cellar with his clothing on fire; that witness took Humpert's shirt off, the fire from his clothes, and in about the time a person could count ten, a loud report was heard and the front of Fuchs' building came out.

At the conclusion of the testimony the court, at the instance of defendants, gave instructions in the nature of demurrers to the evidence, whereupon plaintiff took a nonsuit, etc.

1. It will have been inferred from the foregoing quotations from the pleadings and the evidence that this cause requires consideration from two points of view, one relative to the pleadings, the other to the evidence.

In the first place, there is no evidence to show that the city contracted with the grantors and their assigns of Fuchs to "keep and maintain said sewer in good order and to care for the said sewer, so that said lot and any improvements which might be put thereon, would be free from danger of injury from and on account of said sewer and the use thereof." This being the case, there is no right arising out of *contract* which could hold the city liable in the premises.

VOL. 133 mo—13

2. And it is patent of record that the other portions of the petition do not state that it was the *duty* of the city to keep Mill Creek sewer free from noxious or dangerous gases or free from fluids and substances which would generate such gases. Unless the *duty* of the city to do this is alleged in the petition, it states no negligence; for duty unperformed is the *sole predicate* of negligence, and without it, the latter can not exist. Cooley, Torts [2 Ed.], 791, 792; *Railroad v. Stark*, 38 Mich. 714; *Cole v. McKey*, 66 Wis. 500; 1 Shearm. & Redf. Neg. [4 Ed.], sec. 8; *Hallihan v. Railroad*, 71 Mo. 113.

The petition, therefore, states no facts sufficient to constitute a cause of action; a fatal defect which may be noticed in this court for the first time. *Smith v. Burrus*, 106 Mo. *loc. cit.* 97, and cases cited. Or, on which account objection could have been taken in the lower court to the introduction of any evidence. *Butler v. Lawson*, 72 Mo. 227.

Other matters in regard to the petition will receive comment in a subsequent paragraph.

3. Inasmuch as the trial court granted instructions in the nature of a demurrer to the evidence, it has been thought proper to make exhibition and profert of that evidence somewhat at large. In cases of this sort, as must be obvious, *facts* are *indispensable factors* in determining the correctness of the action of the trial court in nonsuiting the plaintiff, since those facts must constitute the πoῦ στῶ of plaintiff's action and of the defendant's defense.

From the facts in evidence it appears illuminating oil that is sold as kerosene (coal oil) will not give off vapor nor produce gas under ordinary temperature; that it only explodes or burns by *contact;* that crude petroleum if placed in a large open vessel in a *closed* room, would after a short time, if subjected to a tem-

perature of about sixty degrees Fahrenheit, give off sufficient *vapor* not *gas*, to cause an explosion if the room were entered with a light.

There was *no evidence*, however, as to *what* the *temperature* of the *sewer* was, nor as to what the effect would be in the way of generating gas or vapor in a sewer where, according to the testimony, the proportion of the crude petroleum, etc., must have been exceedingly *small* when contrasted with the vast quantities of water contained in a sewer sixteen feet wide, twelve feet high, and from five to six, seven, and eight feet deep, even if we adopt the *bare conjecture* that there was as much as three thousand or four thousand gallons of oil turned into the sewer. It is true that the testimony shows that naptha, etc., would give off vapor at a much lower temperature than crude petroleum, but there is no testimony showing what the temperature of the sewer was, nor that any naptha, etc., was turned into the sewer on the day of the fire. So that, under the testimony, we must put out of view as constituents of the litigated injury, naptha and gasoline, because not shown to have escaped from the tanks nor to have been conducted into the trenches leading into the sewer, and besides, conceding such escape and such conducting of those fluids, *no temperature* of the *sewer shown*. So that, under the testimony, kerosene or coal oil and crude petroleum must also be excluded from consideration as injury-producing ingredients, because the former does not generate *either* gas or vapor under ordinary temperature—sixty degrees —nor the latter generate anything but *vapor, not gas*, under that temperature, and no testimony as to what degree of heat or cold existed in the sewer, and *gases, not vapors* are alleged in the petition as the cause of the explosion. These things alone would certainly seem

to warrant the ruling of the trial court in giving the instructions complained of.

4. But other inferences are to be drawn from the facts in evidence already related which, if possible, even more strongly tend to support the conclusion reached by that court. It can not be known with any plausible degree of probability from the facts developed in evidence *what* was the cause of the explosion. No one can carefully read the testimony, and, after due deliberation upon it, be enabled to say what gas or combination or commingling of gases produced the unfortunate result which gave origin to this action. The conditions were favorable, as the evidence shows, to the generation of several gases, viz.: methane or marsh gas or carburetted hydrogen, formed by the decomposition of vegetable matter under water, also known as fire damp, colorless and inodorous, which is the cause of the explosions which so frequently take place in coal mines, and is given off when the mud in stagnant pools and marshes is stirred; and the indications are of the possibility of making this gas from the *elements* since its constituents may be thus formed (Remsen, Organic Chem. 23, *et seq.*) and which constitutes the most abundant ingredient of coal gas; (Fownes, Elem. Chem. 299) sulphuretted hydrogen, or hydrogen sulphide, also a colorless gas, but by no means inodorous, having the odor of putrid eggs, and being the frequent product of the putrefaction of organic matter, both animal and vegetable. *Ib.* 173.

Now, if we say nothing of a gas or gases which might result from an admixture of those aforesaid, and if we admit that the conditions were also favorable to the generation of gas in the sewer from the oils introduced therein, as one of the incidents of the fire, still we are confronted by the rule which declares that where an action is brought for damages, which are

occasioned by *one* of *two* causes, for one of which defendant is *responsible*, and for the other *not*, the plaintiff is fated to failure if his evidence fails to show that the damages were produced by the former, or if, from the evidence, the probabilities are equally strong that the damages were caused by the one as by the other. *Searles v. Railroad*, 101 N. Y. 661. This principle finds recognition in *Priest v. Nichols*, 116 Mass. 401, and *Smith v. Bank*, 99 *Ib.* 605.

5. Recurring for a moment to the petition, preparatory to a further discussion of the evidence from other points of view, we find that it charges that "said sewer was provided with openings especially designed to carry off any gases which might arise in said sewer, and be liable to combustion and explosion, etc., etc., yet said city, its agents and servants, knowing that said defendant the Waters–Pierce Oil Company, had flooded said sewer with oil, neglected to open said vents [and carelessly and negligently to take measures and precautions to prevent gases arising in said sewer so as to endanger the same,]" etc.

The words not included within the brackets are those which allege plaintiff's cause of action, because where a particular act of negligence is specified as a cause of action, there evidence will not be received to support a general allegation of negligence, but the plaintiff will be confined to the act of negligence specifically assigned. *Schneider v. Railroad*, 75 Mo. 295; *Waldhier v. Railroad*, 71 Mo. 514.

From which premise it results that no evidence was properly admissible in regard to the words in brackets. Besides, those words were but the statement of a *legal conclusion;* something not traversable; *no issue* of *fact* could be raised upon them. Bliss, Code Plead. [3 Ed.], secs. 212, 213, 413. Under our code, the facts in pleading are constitutive, and in order to be proved

must be distinctly alleged. *Pier v. Heinrichoffen*, 52 Mo. 333; *Bank v. Hatch*, 78 Mo. 13; *McKinzie v. Mathews*, 59 Mo. 99; *Nichols v. Larkin*, 79 Mo. 264; *Lanitz v. King*, 93 Mo. 513.

Taking, then, the facts specifically assigned as negligence, and contrasting them with those offered in evidence in their support, we find that within a radius of two hundred and fifty feet from Fuchs' place of business there were four openings through which the gases in the sewer could escape, saying nothing of the sewer connections at Peters' store, and at Follenius marble works, and so the only thing that remains of plaintiff's claim of the city's negligence in this regard is as to the manhole in the center of the street where Fourth and Fifth streets intersect each other, and that at the sidewalk on the west side of Fifth street.

Respecting the first one, Dr. Fuchs' testimony shows that it was constructed with a goose neck so as to prevent the escape of gases, having been changed from a straight pipe, because the people in the locality complained of the odors formerly coming from it, so that even if the covering had been removed from *this* manhole, no gases could have escaped, and it will not be presumed that plaintiff intended to include in her petition *this* manhole, but only those whose covers if removed would have given ventilation to the sewer; that is to say, egress for the gases therein.

As to the second manhole cover, it was the only one which could have been removed that was not removed. But did the nonremoval of *this one so* retard or prevent the escape of gases as to cause the accident? If it did, then the burden is on *plaintiff to show that it did.* It devolved upon her to "prove facts and circumstances, from which it can be ascertained with reasonable certainty what particular precaution the defendant ought to have taken but did not take" (1 Shearm. &

Redf. Neg. [4 Ed.], sec. 57), which of course would include as a legitimate corollary therefrom, that had such particular precaution been taken, the reasonable probability is that the accident would not have occurred.

Thus in *Daniel v. Metropolitan R'y Co.*, L. R. 3 C. P. 216, WILLES, J., said: "It is necessary for the plaintiff to establish by evidence circumstances from which it may fairly be inferred that there is reasonable probability that the accident resulted from the want of some precaution which the defendants might and ought to have resorted to; and I go further, and say that the plaintiff should also show with reasonable certainty what particular precaution should have been taken." Though the judgment in this case was reversed on another ground, this doctrine was distinctly affirmed in the same volume (591), and in the house of lords (L. R. 5 H. L. 45), and the language employed by WILLES, J., has been frequently cited and quoted with approval. *Hayes v. Railroad*, 111 U. S. 228; *Railroad v. Stebbing*, 62 Md. 504; *Williams v. Railroad*, L. R. 9 Exch. 157; *Railroad v. Stout*, 17 Wall. 657; *Randall. v. Railroad*, 109 U. S. 478; *Lovegrove v. Railroad*, 16 C. B. N. S. 669.

In the case at bar there was no attempt to make the proof here indicated as necessary; in short, to connect the neglect to remove the cover of the single manhole with the accident.

In illustration of this principle it has been ruled where the jury are told that if all the evidence satisfied them that there had been negligence on the part of the defendant, although they might not be able to satisfy themselves *in what* that negligence consisted, they would be authorized to find a verdict for plaintiff, that such a charge was *erroneous;* that if the jury could not find any rational ground upon which to impute negli-

gence to defendant, they should give a verdict in its favor. *McCaig v. Railroad*, 8 Hun, 599; *Searles v. Railroad, supra.*

6. Again, if the city is to be held responsible for failing to keep open the vents to the sewers within its jurisdiction, is it to be held liable also if some person passing while the vents are open casts a lighted match into one of them, or the gas from it rises and catches fire from a street lamp, thereby causing an explosion? Is it possible that the city be thus held responsible whether it *does* or *does not* open vents? And yet if the position taken by plaintiff as ground for recovery in this action be correct, that the city is responsible for the gases which breed in its sewers, then the spectacle will soon be presented of actions for damages against the city, because: *First*, it does *not* open its sewers and thereby allow the gases therefrom to escape, thereby causing an explosion; because, *second*, it *does* open its sewers, and thereby an explosion is caused; because, *third*, it opens its sewers to allow the gases to escape, and thereby becomes liable for disease and death scattered by reason of the escape of such gases; because, *fourth*, it does not *pump out* the sewage from the sewers, or at least does not use a liberal quantity of *disinfectants* so as to *deodorize* the contents of the sewers and thus render them if not *sweet*, at *least innocuous!*

Such are the *possibilities of* municipal liability which present themselves if the present action can be maintained. And if it can, it might be well to suggest that if the city is thus to be made an *insurer, it* ought, at least, as *some compensation*, to be allowed to *issue accident policies*, and *take premiums* on the multitudinous risks it is thus compelled to assume. Hitherto it had been supposed that it was the peculiar and exclusive purpose and function of sewers, and that they were

adapted, devised, and designed to conceal and carry off the foulness which accumulates where great bodies of people congregate, and not to disseminate mephitic odors and gases, thus poisoning the atmosphere throughout the city.

7. Furthermore, "Mill Creek Sewer," as was conceded at the trial, was constructed in a manner that left nothing to be desired; it had been built some thirty-four years, and no accident of the nature now presented had ever occurred in it. Indeed, it does not appear that an occurrence of such sort had ever before happened. Now it is settled by abundant authorities and by numerous and frequent adjudications that it is not negligence to omit a precaution which, if taken, would have prevented the injury, when the injury *could not reasonably have been anticipated and would not, unless in exceptional circumstances, have happened,* because of the omission. Such instances are assigned to the domain of *inevitable accident,* for which, no one being negligent, no one is responsible.

Thus in *Dougan v. Champlain, etc., Co.,* 56 N. Y. 1: "D., plaintiff's intestate, was a passenger upon defendant's boat on Lake Champlain. The forward deck was surrounded by bulwarks three or four feet high, with gangways upon each side closed by rails hinged to the bulwarks and of the same height, and coming down upon stanchions in the center of the gangway, leaving the space beneath open. This deck was not designed for passengers, but they were permitted to come upon it with knowledge of defendant's employees. D. came out thereon, his hat blew off, he sprang to recover it, slipped under the gangway rail, fell overboard and was drowned. It appeared that all the boats upon the lake were constructed in the same manner; that they had been so run for many years, and there was no proof tending to show that anyone

had ever before gone overboard in this way, or that such danger had been apprehended. *Held*, that the evidence failed to show negligence on the part of defendant, and that plaintiff was properly nonsuited."

So, too, in *Hubbell v. Yonkers* "plaintiff was riding along one of defendant's streets, the roadbed of which was thirty feet wide, macadamized and in good condition. On one side, where the street was graded up about twelve feet, there was a sidewalk ten feet wide, separated from the roadbed by a curbstone eight inches high. There was no fence, wall, or other obstruction to guard the outer edge of the sidewalk. The horse attached to the wagon in which plaintiff was riding became frightened and commenced to shy, and, in spite of the efforts of the driver, went over the curbstone and sidewalk and down the embankment, carrying the wagon and plaintiff with him. In an action to recover damages, for injuries received by plaintiff, it appeared that the street had been in the same condition since its opening, *over ten years before*, and, so far as appeared, no similar accident had occurred. *Held*, that defendant was not liable, that the accident was one of a class so rare, unexpected, and unforeseen, defendant could not be charged with negligence for a failure to guard against it." 104 N. Y. 434.

A mule caught its foot in a hole in a railroad track so small that no one could have foreseen such result. *Held*, no liability. *Nelson v. Railroad*, 30 Minn. 74.

Similar nonliability was announced where a workman was painting by lamplight the inside of a tank with an approved and long used paint, bought ready for use, and the benzine in the paint caused an explosion. *Allison Mfg. Co. v. McCormick*, 12 Atl. Rep. 273.

From some unexplained cause a telegraph wire across a track sagged, and hitting a brakeman on top

of a car, broke, at the same time becoming fastened to the car brake.  The end caught a man engaged in business near the depot, and the wire drawn along by the moving train the man was killed.  *Held,* to be an accident.  "Negligence," says MITCHELL, C. J., "is not to be presumed upon the fact of an occurrence like that involved in the present case, the statement of which suggests its anomalous, exceptional, and extraordinary character."  *Railroad v. Locke,* 14 N. E. Rep. 391.

Like rulings have been announced where accidents have happened from machinery, where their liability to happen is proved only by their actual happening. *Richards v. Rough,* 53 Mich. 212; *Sjogren v. Hall, Ib.* 274.

In *O'Mally v. Railroad,* 113 Mo. 319, the tunnel had been used for thirteen years, and in an action brought for the death of the plaintiff's husband, employed in the defendant's tunnel, through which it operated locomotives and cars, and the petition charged that the tunnel, because the fan that ventilated it was out of repair, was in a dangerous condition, being filled with steam, smoke, and poisonous gases; and that defendant, well knowing this fact, which was unknown to the deceased, negligently ordered him to go into the tunnel, whereby he was choked, strangled, and killed.  *Held,* that, as there was total failure of the evidence to show that the smoke in the tunnel when decedent entered was dangerous to human life, or to show that defendant could have anticipated a condition of the tunnel dangerous to human life, plaintiff could not recover.  To the like effect see Cooley on Torts, 91, *et seq.; Withers v. Railroad,* 27 L. J. Exch. 417; *Loftus v. Ferry Co.,* 84 N. Y. 455; *Cleveland v. Steamboat Co.,* 68 *Id.* 306; *Sutton v. Railroad,* 66 *Id.* 243; Bishop, Noncont. Law, secs. 182, 447; *Bishop v.*

*Railroad*, 14 R. I. 314; *Wright v. Wilmington*, 92 N. C. 156.

The same principle is recognized in *Flori v. St. Louis*, 69 Mo. 341, where the city was held liable to a person for injuries inflicted by the fall of a market house caused by a windstorm of unprecedented force and violence. It is unnecessary to say here whether the case might not have rested on another ground. It is certainly opposed, in any event, to a recovery by plaintiff.

8. Moreover, the defendant city in the construction of "Mill Creek Sewer" and in its maintenance, was and is engaged as a governmental agency in the performance of a public, sanitary duty for the public good, and not for its own private advantage or emolument. In such circumstances, it is well settled in this state, as well as in many other jurisdictions, that a municipality is not liable in damages for the wrongful or negligent acts of its officers and servants, unless made thus liable by positive law or by inevitable implication. *Murtaugh v. City*, 44 Mo. 479; *Heller v. Sedalia*, 53 Mo. 159; *McKenna v. St. Louis*, 6 Mo. App. 320; *Armstrong v. Brunswick*, 79 Mo. 319; *Carrington v. St. Louis*, 89 Mo. 212; *Maxmilian v. Mayor, etc.*, 62 N. Y. 160; *Hill v. Boston*, 122 Mass. 344; *Detroit v. Blackeby*, 21 Mich. 84; 2 Dillon, Mun. Corp. [4 Ed.], secs. 965, 965a, 975, 976, 977, 980, and cases cited.

*Carrington v. St. Louis, supra*, while it correctly states the principle applicable to this class of cases, yet its application in that instance suggests an interrogation point, as to which see sections 58, 60, 210, 974, 975, Dillon, Mun. Corp. [4 Ed.].

Besides, if the theory contended for by plaintiff is to prevail, it would result in casting on defendant city a task impossible of performance, as already stated,

and one which if it could be performed would subject the city to fresh liabilities by reason of such performance, and in addition thereto, would *defeat* and *destroy the very purpose and function which a sewer is obviously designed to accomplish, to wit, to prevent the air of the municipality from being contaminated by foul odors, and other contagious and infectious gases and emanations.*

When a city has, as in this instance, built a sewer in a most admirable manner and has kept such health-preserving conduit free from obstructions, its complete duty, whether considered a *public* or a *corporate one,* has been entirely discharged.

9. It only remains to say that there is nothing in the facts in evidence which by any possibility casts any blame or liability on defendant oil company. It can not be considered as having permitted the oils to escape and run into the sewer, merely because it did not forbid the oils which ran from its premises into the streets and on the railroad tracks from being turned, by means of trenches dug into the sewer, nor because it did not use force to prevent this from being done.

For the foregoing reasons the judgment should be affirmed; and for which reasons I dissent from the majority opinion. BURGESS and ROBINSON, JJ., concur.