JOHN R. WEESEN, Respondent, v. THE MISSOURI
PACIFIC RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, January 5, 1914.

1. CARRIERS OF LIVE STOCK: Railroads: Delayed Shipment. The plaintiff sued to recover damages for a delayed shipment of hogs by the defendant railroad company. The plaintiff delivered the hogs at Tipton to be shipped to East St. Louis. While they were en route, a heavy rainstorm washed out the defendant's track ahead of the train, and the stock arrived too late for that day's market. *Held*, that the delay was caused by an unusual and unavoidable delay.

2. ———: ———: Negligence. It is not negligence to fail to take precautionary measures to prevent an injury which, if taken, would have prevented it when the injury could not reasonably have been anticipated and would not, unless under exceptional circumstances, have happened.

Appeal from Moniteau Circuit Court.—*Hon. John M. Williams*, Judge.

REVERSED.

*C. D. Corum* for appellant.

*R. M. Embry* for respondent.

JOHNSON, J.—This is an action for damages plaintiff alleges were caused by negligence of defendant, a common carrier, in the transportation of three carloads of fat hogs to market. Plaintiff recovered judgment in the circuit court and defendant appealed.

The material facts of the case are as follows: On June 8, 1910, plaintiff delivered the hogs to defendant at Tipton, Mo., for transportation to the National Stockyards at East St. Louis, Ill. The train carrying the hogs left Tipton at nine o'clock in the evening and if nothing unusual had occurred would have arrived at the stockyards the next morning in time for the market of that day. But delays occurred and the shipment did not reach its destination until the afternoon of Saturday, June 13th. Plaintiff contends that these delays, which were unusual, were caused, in part, at least, by negligence of defendant while defendant seeks to escape liability for the damage they caused plaintiff, on the ground that an act of God was their sole cause. Shortly after the train carrying the hogs left Tipton the country east of Jefferson City was swept by a rainstorm of unprecedented violence and magnitude which caused extensive landslides at Bonnot's Mill, thirteen miles east of Jefferson City and at St. Aubert, a station seven miles further east. The railroad which skirts the Missouri River bluffs at these places were covered by these landslides. Shortly thereafter these obstructions were discovered and immediate and efficient measures were taken by the employees of defendant to clear the track. The obstruction at Bonnot's Mill was removed and the track made safe for the passage of trains before eleven o'clock the next morning. The train carrying the hogs which had been held overnight at Jefferson City passed Bonnot's Mill shortly after the track was cleared and proceeded to St. Aubert. The agents of defendant in charge of the work expected to clear the track at the latter place that morning but their efforts to that end

were defeated by a peculiar condition of which they were ignorant until its existence was revealed during the progress of the work. The landslide from the slope of the bluff was not as extensive at this place as at Bonnot's Mill and the force employed by defendant would have removed it in two or three hours but for the fact that the railroad embankment had been undermined by a new current in the river and these inroads which were not disclosed until after the men began removing the mud from the track co-operated with the excessive rainfall to maintain an obstruction of the most obstinate character. As fast as mud was removed from the track it was replaced by a fresh slide and this condition obtained until the hole the river had made in the base of the embankment had been filled. Defendant's superintendent who hastened to the scene and took charge of the work testified on direct examination:

"How did it compare with similar troubles on other dates, of a like nature? A. That was the most serious trouble of any trouble we ever had on the road of that nature. We never were obstructed on the road as long as we were at this time.

"Q. What efforts did the company make towards remedying this as it occurred? A. Why, we got all the material necessary—all the material we could secure, which was sufficient, and all the men we could handle and all the men that could work around it, and we worked at it continuously until we got the trains going.

"Q. What kind of material? A. Filling, flags, cinders, gravel, chatts, crossties and timbers.

"Q. About how many men were working there? A. Well, we never had less than a hundred at any time. We took gangs off of the River Route that we were working on, on washouts and slides, and brought them down, because this was more important than the River Route.

"Q. When you first got to the scene of the washout or the slides, did you then realize it would be several days before trains could pass? A. No, I thought by the time we got another train load of material unloaded, and the track laid on it, that they would go over it; but I found out after we got that in and tried to pass a train we couldn't do it. It just kept going down.

"Q. And when did you first realize it would be impossible to get trains over for some time? A. Oh, eight or nine o'clock that night.

"Q. The night of the 9th? A. Yes, I knew we couldn't get them over. In fact, I wouldn't risk it.

"Q. About what time did this trouble begin to get so serious that it could not be remedied within a few hours? A. Well, it seemed afterwards it was that serious from the start, but we didn't appreciate it. Similar cases heretofore and since have been cured by unloading a few carloads of material in them, and pull the cars over.

"Q. If it had been a mere landslide covering the track a few feet deep, how long would those landslides reasonably have delayed a train? A. Not over a couple of hours. The worst we had at that time was at the east switch at Bonnot's Mill, and that we cleared in about two hours so the trains could get through.

"Q. Will you describe once more now the real difficulty at St. Aubert so I can get that clear? A. The real difficulty according to our observation was the fact that the river had changed its course and cut the toe of the bank—that is the name we apply to the bottom of the bank—and that permitted the weight above to go down. We never got a permanent bank there until we unloaded sufficient material and let it slide down to fill that hole the river had made to restore the bank to its original shape.

"Q. Have you any idea how many carloads of chatts and material were unloaded there? A. There

were over one hundred and fifty. I don't know how many more. I know it was that many. There was no expense spared. We didn't look at the expense when we went to do it.

"Q. Can you tell about when the first train passed over this place? A. About when? Q. Yes. A. About somewhere between 11:30 and noon. They were standing all over the road waiting to move as soon as we got it open. Q. That was on the 10th? A. Yes, that was on the 10th. They were standing on each side from Jefferson City and St. Louis waiting to get by as soon as we could take them. My impression now is that No. 21, local passenger train, was the first train to go through.

"Q. Was it fixed permanent at that time, or just temporarily? A. We did a great deal of work after that time, but we got it fixed so we could pass these trains. We worked on it for a couple of weeks after that until we got it repaired so it was permanent."

On cross-examination the witness stated that the cause of the slide "was the diversion of the stream that seemed to cut away the toe of the bank. The bank has a toe we call it and the excessive rain softened the roadbed, came down under the track from the bluff and caused it to slide into that hole."

It appears that at these places where the river runs close to the foot of the bluffs, defendant, for the purpose of preventing landslides, had graded or cut the face of the bluff on a gradual and what is called a standard slope.

Plaintiff does not accuse defendant of negligent construction nor of negligence in not preventing landslides caused solely by the extraordinary storm but does contend, and the trial court accepted his view, that the evidence tends to show that defendant was negligent in not sooner discovering and remedying the defect caused by the inroads on the embankment of the new river current.

In the instructions given at the request of plaintiff the jury were told that if they should find "from the evidence that at the time mentioned in the petition, to-wit, June 8, 1910, the defendant's roadbed and track became in an impassable condition on account of the washing of the river against the side of same, and on account of an unusual and unprecedented rainfall, both concurring, and if you find from the evidence that defendant was negligent in not protecting its said roadbed from the action of the river, and that but for said negligence defendant's track would not have become impassable notwithstanding the unusual rainfall, then such rainfall and the impassable condition of defendant's track did not relieve defendant from its duty to transport plaintiff's stock to its destination within a reasonable time after same was received by defendant for transportation."

This instruction and the theory of negligence it embodies rests primarily on the following testimony elicited from defendant's superintendent on cross-examination: "Q. I want you to understand about one proposition. You spoke about excessive rainfalls? A. Yes, sir. Q. And you spoke about the change in the current of the river? A. Yes, sir. Q. Which was the cause of this delay that you speak of where the track slided away from you there? A. The primary cause was the excessive rainfall soaking that bank and getting it so wet it permitted the trains to press it so it followed the toe out into the river. Q. Which do you say was the cause? A. Both of them. Q. Both? A. Yes; the primary cause, I think, was the rain. Q. You do say, however, that the whole cause was the combined result of the rain and the change in the current of the river? A. Yes, if it hadn't been for the rain the bank never would have gone, I don't think. That softened it and made it wet."

There is nothing in the evidence to show that defendant was remiss in sending trackwalkers over the

road but it is argued that had they exercised reasona-ble care they would have discovered the changed cur-rent and anticipated that if unchecked in its ravages it would undermine the track and interfere with the transportation of persons and property but as we view the evidence this argument proceeds from conjecture and speculation rather than from an evidentiary foun-dation of substance and probative force. There was no visible evidence above the water line of the inroads of the new current on the embankment. The assault was concealed and to infer that the trackwalkers and other inspectors sent over the line by defendant should have discovered this hidden and silent enemy would be to convict them of wrongdoing upon mere fancy and con-jecture. We regard this as a case for the application of the rule that "it is not negligence to fail to take precautionary measures to prevent an injury which, if taken, would have prevented it when the injury could not reasonably have been anticipated and would not, unless under exceptional circumstances have hap-pened." [Am. Brewing Assn. v. Talbot, 141 Mo. 674.]

The burden is on plaintiff to show a negligent ori-gin of the delays that resulted in his damage but the evidence discloses indisputably that the delays were due to causes which human care and foresight could not be expected to have anticipated. As is said in the case just cited:

"Ray, in his work on Negligence of Imposed Du-ties, pages 133, 134, says: 'Mischief which could by no reasonable possibility have been foreseen, and which no reasonable person would have anticipated, cannot be taken into account as a basis upon which to predi-cate a wrong. A reasonable man does not consult his imagination, but can be guided only by a reasonable estimate of probabilities. The reasonable man, then, to whose ideal behavior we are to look as the stand-ard of duty, will neither neglect what his reason and experience will enable him to forecast as probable, nor

conduct, on a basis of bare chances, a business whose success is dependent upon his accuracy in forecasting the future. He will order his precaution by the measure of what appears likely in the usual course of things. The proper inquiry is not whether the accident might have been avoided if the one charged with negligence had anticipated its occurrence, but whether, taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence. The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor of any particular means which it may appear, after the accident, would have avoided it. The requirement is only to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident. . . The prudence and propriety of men's doings are not judged by the event, but by the circumstances under which they act. If they act with reasonable prudence and good judgment they are not to be made responsible because the event from causes which could not be foreseen nor reasonably anticipated had disappointed their expectations.' '' [See, also, Commission Co. v. Railroad Co., 113 Mo. App. 544, and cases cited.]

The learned trial judge erred in overruling the demurrer to the evidence. Clearly plaintiff's damages, including that resulting from the loss of one of the hogs, were caused by an unusual but unavoidable delay in the transportation.

The judgment is reversed. All concur.