## JOHN PEETZ, Respondent, v. ST. LOUIS TRANSFER COMPANY, A CORPORATION, Appellant.

St. Louis Court of Appeals. Argued and Submitted November 6, 1917. Opinion Filed December 4, 1917.

1. **MASTER AND SERVANT: Injuries to Servant: Knowledge of Master of Dangerous Condition: Question for Jury.** In an action for injuries to a transfer company's teamster while unloading a wagon, whether defendant transfer company knew, or by the exercise of ordinary care should have known, that nails were protruding from the bed of the wagon, and that the wagon would be used for the delivery of freight, *held* a question for the jury.

2. ———: ———: **Dangerous Condition: Sufficiency of Evidence.** In such action, evidence *held* to justify the jury in inferring that the nails in the position found had been driven in the bed of the wagon to secure cleats, and left there when the cleats had been removed, and to warrant the jury in inferring that the wagon with the nails in the bottom of its bed had been in defendant's possession and under its control long enough, that is, a reasonable time, to charge defendant with knowledge of the presence of the nails.

3. ———: ———: **Contributory Negligence of Servant.** Where a transfer company's driver took charge of its wagon, first about dark, and then early the next morning, when it was heavily laden, he was not chargeable with contributory negligence in failing to see nails in its bed, on one of which he tripped.

4. ———: ———: **Safe Place to Work: Liability.** An employer is under a plain duty to use ordinary care in providing its employee with a reasonably safe place in which to work, under penalty of liability for injuries to the employee through its default.

5. ———: ———: **Case for Jury.** In an action for injuries to a transfer company's teamster when he tripped over a nail in his wagon

and had his leg crushed by a barrel of molasses, *held* a case for the jury under the evidence.

6. **TRIAL PRACTICE: Evidence: Objections in Trial Court.** Where no objection was made in the trial court to the line of examination and testimony as assuming a fact not in evidence, the admission of plaintiff's testimony as to the size of the nails brought to him from the bed of the wagon, and that they were similar to those in the wagon, was not error.

7. **MASTER AND SERVANT: Injuries to Servant: Evidence.** The fact that cleats had been nailed onto wagons of defendant, and the fact that nails were found in the bed of plaintiff's wagon, in such a position as to warrant the inference they had been left there when the cleats were removed, made admissible evidence of the nailing of cleats on some wagons of defendant, without connecting it in any way with the wagon plaintiff used.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. J. Hugo Grimm*, Judge.

AFFIRMED.

*Kelley & Starke* for appellant.

(1) The motion for nonsuit should have been granted, for the following reasons: (a) There was no evidence that defendant knew of the alleged existence of the nail or nails that are claimed to have caused the injury, nor is there any evidence that defendant in the exercise of ordinary care should have known of such nail or nails. Henson v. Stave Co., 151 Mo. App. 234; Wojtytak v. Coal Co., 188 Mo. 260, 281; Pippin v. Construction Co., 187 Mo. App. 360; Bowen v. Railroad., 95 Mo. 268, 276. (b) Plaintiff had equal opportunity with defendant to notice that nail, if any nail were there, and was fully as capable of foreseeing such dangers, if any, as lurked in it. His contributory negligence bars recovery. Lowe v. Railroad Co., 265 Mo. 587; McGinnis v. Press Brick Co., 261 Mo. 287; Pohlman v. Car & Foundry Co., 123 Mo. App. 219; Rogers v. Packing Co., 185 Mo. App. 99. (c) The chance of the injury claimed to have been caused by that nail, if any were there, is so remote that defendant could not be expected to contemplate it; and therefore was not at fault in failing to

provide against it. Halloran v. Pullman, 148 Mo. App. 243; Weesen v. Railroad, 175 Mo. App. 374. (2) It was reversible error to allow a bundle of nails to be shown to the jury which plaintiff identified as having been shown him shortly after his injury, there being no evidence of any kind to show that the nails produced had any connection with the injury or with the wagon in which it occurred. It was only natural for the jury to think that the exhibited nails came from that wagon. (3) It was error to admit evidence of the nailing of cleats in some wagons used by defendant without connecting it in any way with the wagon involved in this case. Particularly is this true when the only evidence on the point was positive that no cleats had been put into that wagon.

*Leahy, Saunders & Barth* for respondent.

(1) The court did not err in overruling the defendant's motion for nonsuit, for the following reasons: (a) There was ample evidence to establish the fact that the defendant knew, or, by the exercise of reasonable care, might have known of the existence of the nails that caused the injury. The evidence established that nails of the size and description herein involved were frequently used upon the beds of wagons of the defendant and left protruding; that plaintiff had no regular wagon to drive, and was furnished with the wagon in question by the foreman of the company, which wagon had been left the afternoon prior to the injury in the charge of the foreman of the defendant. The law is well established that it is "the master's duty to use ordinary care to inspect and keep appliances and tools in a reasonably safe condition for the use of his servants" (Deckard v. Railroad, 111 Mo. App. 124). And further it is equally clear that "the duty of inspection is affirmative and must be continually fulfilled and positively performed. Anything short of this would not be ordinary care" (Cody v. Lusk, 187 Mo. App. 337). And, finally, it is the universal authority that the question of the master's

knowledge of the defect or his ability to have discovered the same by the exercise of this "ordinary care" is one "for the jury, and not for the court to determine." Schuerer v. Rubber Co., 227 Mo. 368; Tallman v. Nelson, 141 Mo. App. 478, 485; Coontz v. Missouri Pac. Ry. Co., 121 Mo. 652, 657-8; Deckard v. Railroad, 111 Mo. App. 117, 124; Covey v. Hannibal & St. Joseph Ry. Co., 86 Mo. 635, 641-2; Schuerer v. Railroad, 227 Mo. 347, 368; Cody v. Lusk, 187 Mo. App. 327, 337; Gordon v. Railroad, 222 Mo. 516, 528; O'Flanagan v. Railroad, 145 Mo. App. 276; Bassett v. Railroad, 166 Mo. App. 619, 624. (b) There is not a particle of evidence of contributory negligence in the record. Here, too, is an issue of fact to be resolved by the jury. There is not even evidence of knowledge on the part of the plaintiff of the lurking danger, and even though there were, by no possibility can it be said that the defect was so imminently dangerous that plaintiff was guilty of contributory negligence as a matter of law. Settle v. St. Louis & San Francisco R. R. Co., 127 Mo. 336, 341, 344; Houts v. Transit Co., 108 Mo. App. 686, 694; Bliesner v. Distilling Co., 174 Mo. App. 139, 147; Johnson v. Construction Co., 188 Mo. App. 105; Barnard v. Brick & Coal Co., 189 Mo. App. 417. (c) A tripping over a protruding nail or nails in the bed of a delivery wagon, left there by the negligence of the defendant, is by no means a "remote" consequence that "defendant could not be expected to contemplate." The apposite principle is thus announced: "It is not essential that defendant could have anticipated the very injury complained of, or that it would have anticipated that it would have occurred in the exact manner in which it did occur, but it is sufficient if the negligence of the defendant was the proximate cause of the injury." Bliesner v. Distilling Co., 174 Mo. App 145; Dean v. Railroad, 199 Mo. 386, 411; Zeis v. Brewing Ass'n, 205 Mo. 638; Philips v. Railroad, 211 Mo. 419, 442; Buckner v. Horse & Mule Co., 221 Mo. 700, 710; Woodson v. Met. Street Ry. Co., 224 Mo. 685, 707. (2) By no stretch of circumstances could it have been reversible error for witness to have

referred to a bundle of nails shown to him, as answering the description of the character and size of "twenty-penny nails," which kind of nails witness testified were in the bed of the wagon. Moreover, the plaintiff, without objection on the part of defendant, had theretofore testified that those very nails were brought to him after the accident, by someone who claimed to have drawn them from the bed of the wagon. (3) It was in no sense error to admit evidence of the fact that nails were promiscuously driven in the beds of the defendant's wagons and allowed to protrude. Testimony on this point was invited by the defendant's own course of cross-examinations. Moreover, plaintiff had theretofore testified that he had "no regular wagon" to drive but was required to take any one that the foreman ordered.

REYNOLDS, P. J.—Action to recover damages for injuries said to have been sustained by plaintiff while unloading a wagon of a defendant which he had been driving, it being charged in the petition that while plaintiff was lifting or moving one of four barrels of molasses, which were part of his load, from the wagon, a nail protruding from the bed of the wagon caught in the sole of plaintiff's left shoe, tripped him, and caused the barrel which he was then lifting to fall with great force and violence on the lower part of his leg, causing a compound fracture of the leg, in consequence of which fracture he was confined to his bed and house for some time and forced to go on crutches for a long period. It is charged that defendant knew, or by the exercise of ordinary care would have known, that the bed of the wagon had nails protruding from it and that the wagon would be used for the delivery of heavy freight, and that the injuries to plaintiff were directly caused by the carelessness and negligence of defendant in suffering and permitting the nails to be and remain in the bed of the wagon.

The answer, after a general denial, pleaded contributory negligence and assumption of risk. To this a reply in the form of a general denial was filed.

On trial before the court and a jury there was a ver-
following, from which defendant, interposing a motion
dict in favor of plaintiff in the sum of $2500, judgment
for new trial, as also one in arrest of judgment, and ex-
cepting to the overruling of these motions, has duly ap-
pealed.

There are a number of assignments of error but the
points relied upon for a reversal are, first, that the court
erred in failing to sustain demurrers at the close of
plaintiff's case and again at the close of all the case, it
being claimed that there was no evidence that defend-
ant knew of the alleged existence of the nail claimed to
have caused the injury, nor any evidence that defendant,
in the exercise of ordinary care, should have known of
the presence of such nail or nails; that because plain-
tiff had equal opportunity with defendant to notice the
nail, if any was there, and was fully as capable of see-
ing the danger, if any, that lurked in it, and his contrib-
utory negligence bars recovery; and that the chance of
injury claimed to have been caused by that nail, if there
was one there, was so remote that defendant could not
be expected to contemplate it and was therefore not in
fault in failing to provide against it.

It appears by the testimony in the case that about
half past four or five o'clock on the evening of January
5, 1914, plaintiff, who had been in the employ of defend-
ant for a number of years as a teamster, and had been
engaged in that occupation for many years prior there-
to, was instructed to hitch his team to a certain wagon
belonging to defendant and carry a load of chicken feed,
which was contained in burlap sacks, to a railroad freight
house in East St. Louis. The bed of his wagon was fill-
ed with these sacks, each sack weighing something like
100 pounds. He arrived with his load at the freight
house in East St. Louis about half past five on the even-
ing of January 5th, and the sacks were unloaded from
his wagon by the men at the freight house, plaintiff
standing by and checking off but not assisting in un-
loading. After the unloading of the sacks he was given
what is called "a clear receipt," that is, a receipt show-

ing that the burlap sacks had been delivered and were in good order. His wagon being unloaded, plaintiff drove it to one of defendant's barns at East St. Louis, and left it there for the night. The next morning at about 7 o'clock plaintiff hitched his team to the wagon and drove to several railroad warehouses in East St. Louis, and obtaining a load, drove across to St. Louis to the warehouses of several railroads on this side of the river and finally to the freight house of the Wabash Railroad Company. The load consisted of several cases of merchandise, placed in the front of the wagon, then twelve barrels of liquor or liquid of some kind, in three or four rows, and at the rear body of the wagon a parlor organ, cased or boxed, and four half barrels of molasses. The space occupied by this cased organ and these half barrels of molasses, was the width of the wagon bed or body, about eight feet, and extending along the rear end something like four feet. The rear end of the wagon, then to the east, was up against a platform of the Wabash freight house, which platform fronted west so that the organ in the case was in the northeast corner of the wagon bed. Next, and south of the organ, were the four half barrels of molasses, they occupying the southeast corner of the wagon bed, the barrels being placed 2 in a row and 2 deep. For purposes of convenience we designate the molasses barrel next to the organ case No. 1, the half barrel next and south of that as No. 2, the one in front and west of No. 1, as No. 3, and the one south of that as No. 4. It seems that these barrels and the organ case were fitted in very tightly—close together—so that to get them out, according to the testimony of plaintiff, he pulled out the barrel we have designated as No. 3 until it was clear of the other barrels and of the organ case, and then took hold of the chines of barrel numbered 4 and was rolling that out when the sole of his left shoe caught, as he testified, on what he did not know at the time, and the barrel numbered 4, rolling over on him, pinned his left leg between that and No. 3, which had been rolled out, in

198 M. A.—11

such a way as to break his leg about at the ankle, producing what is called "a simple fracture—a comminuted fracture of the tibia and fibula, which are the lower bones in the leg, on the left side in the middle and upper third, a simple fracture," as a surgeon who had attended plaintiff when he was taken to the city hospital testified. The wagon was described as a stake wagon 14 or 15 feet long and about 8 feet across. It was finally loaded at the Louisville & Nashville Depot in East St. Louis a little after 8 o'clock on the morning of January 6th. From there plaintiff drove it over to St. Louis, first, to the Rock Island Depot, where he discharged part of his load, then to that of the Missouri, Kansas & Texas Railroad Company, there unloading another part of his load, and then to the Wabash Freight Depot, where he arrived at about a quarter to eleven o'clock on the morning of January 6th, with the organ and four half barrels of molasses. As plaintiff testified, barrel No. 4 was on his leg, pinning him against No. 3, when persons to whom he called came and took him out from under the barrel and off the wagon. His left foot, he testified, was caught on the left of the sole of the shoe on that foot. The men who carried him to the platform seated him on a box on the platform. Plaintiff testified that when he was taken off the wagon he saw a nail or nails in the bottom of the wagon. The men who were there had a policeman, who was nearby, call an ambulance; he was placed in that and carried to the City Hospital where his leg was set, placed in splints and then in a plaster cast. Remaining in the hospital a couple of weeks, he was removed to his own home, where he was confined for a number of weeks. Plaintiff testified that he suffered great pain from the accident and was disabled for some 6 months after it occurred. As there is no complaint made of the size of the verdict, it is unnecessary to go further into the evidence as to loss of time, suffering, etc.

Plaintiff testified very positively that when he took charge of the wagon on the evening of January 5th, and unloaded it, and again took charge of it on the morning

of the 6th, he saw no nails in the body of it, although he testified he was not looking for nails. Other witnesses, however, testified that it was customary for the defendant company when hauling rolls of rope or machinery of the type which has to be blocked, to have a cooper nail on strips or cleats on the floor of the bed of the wagon to hold the machinery or whatever was in the wagon in place. There were no cleats on the wagon in question at the time of its being loaded and unloaded on the occasion when plaintiff was handling it, but there was testimony of several witnesses to the effect that after the accident they saw from 3 to 6 nails—twenty-penny nails —some protruding above the floor of the wagon towards what was then the end. One or more of the nails appear to have been under the organ case, others under the barrels while in place. They were 7 or 8 inches apart and in a zigzag position, one of them projecting about half an inch above the body, others from a quarter to three-eighths of an inch. How long these nails had been in the wagon bed is not in evidence. While plaintiff was in the hospital a friend of his, who died before the trial of the cause, took a bunch of nails to him, which bunch was in evidence, and several witnesses said that the nails in the bunch shown to them at the trial were the kind of nails—twenty-penny nails—which had been driven into the wagon bed.

There was testimony on the part of defendant to the effect that none of its employees in authority knew of the presence of these nails, and while one of them, a manager or foreman, apparently, testified that cleats were fastened to their wagons on different occasions when they were hauling machinery, he further testified that the wagon which plaintiff was using at the time was not used for that purpose. But he also admitted that he was unable to say, as a positive fact, that no cleats had ever been driven on to this particular wagon. Plaintiff testified that they put the cleats on any wagon.

Under this statement of evidence we think it was a question for the jury to determine whether the defendant knew, or by the exercise of ordinary care could

have known, that nails were protruding from the bed of the wagon, and that the wagon would be used for the delivery of freight, and so the court, at the instance of plaintiff, instructed the jury as one of the elements necessary to recovery by plaintiff in this case. There was substantial evidence that there were from three to six nails in the bottom of this wagon bed, one or more protruding; also that plaintiff's shoe had been caught and held on a protruding nail and that while so held a barrel rolled on and crushed his leg. It was in evidence that defendant did, on various occasions, have cleats nailed to the floors of its wagon beds. On these facts the jury had a right to infer that the nails, in the position found, had been driven in for the purpose of securing cleats, and had been left there when the cleats had been pulled off. This must have been done prior to the time the wagon was turned over to plaintiff, for there is no pretense that any cleats were there when plaintiff first took the wagon. Before that occurred the wagon was in charge of defendant. The teamster who took charge of the wagon immediately after plaintiff had been injured, testified very positively that he saw and counted nails in the body of the wagon, one or more of them protruding above it, this witness testifying that when the wagon had been placed in his charge and had been unloaded, and while he was getting on it, he saw three nails sticking up out of the bed or floor about 5 feet from the rear end of the wagon across the bed, zigzagging and about 8 or 10 inches apart, two of them sticking up, that is not driven all the way down, one up about a quarter of an inch, another about three-eighths, and the third driven down. Those that he saw were straight.

On these facts the jury were warranted in inferring that the wagon with the nails in the bottom of the bed had been in possession and under control of defendant long enough, a reasonable time, to charge defendant with knowledge of the presence of the nails. It is true that plaintiff had an equal opportunity with defendant to notice that the nails were there, but he testifies very positively that he did not see them, and under the facts

attendant on his taking charge of the wagon, first about dark, then early the next morning, and his dealing with it, we do not think they were sufficient to charge him with contributory negligence in the matter. But this lack of knowledge on the part of plaintiff does not exculpate the employer. There was a plain duty resting upon the employer, as has been laid down in a multitude of cases, to use ordinary care in providing his employee with a reasonably safe place in which to work. That was a duty peculiarly resting on him and if he failed in that and the employee came to hurt in consequence of the negligence, the employer is responsible.

Nor can we agree that this case falls within the principle of Halloran v. Pullman Co., 148 Mo. App. 243, 127 S. W. 946, or that of Weesen v. Missouri Pacific Ry. Co., 175 Mo. App. 374, 162 S. W. 304, as claimed by learned counsel for appellant. A protruding nail, in a place over which people are required to walk and work, is a very present and patent sign of danger, an object from the presence of which in such a place it is to be anticipated that danger may result. Danger from it was not so remote as to render it improbable that there was danger to be apprehended from its presence.

Our conclusion on the contention made by learned counsel for appellant, that the nonsuit should have been granted is, that it is untenable.

The second point relied upon by learned counsel is that it was reversible error to allow the bundle of nails referred to, to be shown to the jury, it being claimed that there was no evidence of any kind to show that the nails produced had any connection with the injury, or that they came from this wagon. It is to be said of this, that they were not offered in evidence, or exhibited to the jury, as having been indentified. The fact that they were nails which had been taken out of this wagon bed after the accident, was admitted in evidence without objection.

On redirect examination of plaintiff by his counsel this occurred:

"Q. You were asked, on cross-examination, whether or not a man by the name of Reece brought some nails to you from the bed of this wagon? A. That was what he claimed. I could not say positively whether they were from that wagon or not. I never knew the size of the nail that was in the wagon, only I took his word for it.

"Q. Did he bring the nails to you? A. Yes, sir.

"Q. Are these the nails he brought to you? A. That is the same nails. Same nails and same string is on it."

It will be noticed that no objection was made to this line of examination, nor to this testimony, as assuming a fact not in evidence. Under this we find no error in the admission of the testimony concerning the size of the nails and that they were similar to those in the wagon.

The third point made by learned counsel for appellant, is to the effect that it was error to admit the evidence of the nailing of cleats on some wagons used by defendant, without connecting it in any way with the wagon involved in this case. It is true that there was no direct evidence that cleats had been nailed on this particular wagon. There was evidence, however, even on the part of defendant's witnesses, that it was a custom and habit and practice to nail cleats on the defendant's wagons when used for a particular purpose. True there was no direct evidence that cleats had been nailed to this particular wagon, but the fact that cleats had been nailed on to wagons of the defendant, coupled with the fact that nails were here found, in such a position as to warrant the inference that they had been left there when the cleats were removed, did make that evidence admissible.

Very general attacks are made on the action of the trial court in refusing certain instructions, other than those for a nonsuit, asked by defendant. We see no error in that action.

There is no complaint made of the size of the verdict in this case, and, as before remarked, it is unneces-

sary to notice any of the evidence concerning the extent of plaintiff's injury.

Finding no reversible error in the trial of the cause, the judgment of the circuit court must be and is affirmed. *Allen* and *Becker, JJ.,* concur.

