American Brewing Ass'n v. Talbot.

## American Brewing Association v. Talbot et al., Appellants.

### Division Two, November 9, 1897.*

1. **Warehousemen:** DAMAGES BY FLOOD: ACT OF GOD: CONTRIBU-TORY NEGLIGENCE. The defendants were warehousemen, and their buildings, being warehouses, were caused to sink, and plaintiff's malt stored therein greatly damaged, by the "phenominal" rise in the Mississippi river. *Held,* that the collapse being attributable to the act of God, the defendants can not be held liable for the loss and damage to the malt, unless they were guilty of negligence directly contributing thereto. Under the circumstances stated in the opinion it is held that defendants were not guilty of contributory negligence.

2. ———: NEGLIGENCE: BURDEN OF PROOF. When plaintiff showed the delivery of goods to warehousemen for storage under a contract for hire, and the failure by them to redeliver on demand, it made out a *prima facie* case of negligence against them; but when the defendant showed that the goods were lost by the act of God, the burden shifted to plaintiff to establish that the loss was due to the lack of the exercise of ordinary diligence and care in preserving the goods, and in failing to remove them to a place of safety before the collapse of the warehouse.

3. ———: ———: QUESTIONS FOR JURY AND COURT. What constitutes ordinary diligence and care is always a question to be determined by the triers of the fact, in view of the surrounding circumstances, when there is substantial evidence upon which to submit to them such an issue; but in the absence of such evidence, it becomes a question of law to be determined by the court.

4. ———: ———: PRECAUTION. When an injury can not reasonably be anticipated and would not have happened unless under exceptional circumstances, it is not negligence to fail to take precautionary measures to prevent it, although if taken the injury would not have resulted.

5. ———: ———: THE FUCHS' AND SULLIVAN CASES. In a separate opinion, SHERWOOD, J., compares this case with *Fuchs v. St. Louis,* 133 Mo. 168, and *Sullivan v. Railroad,* 133 Mo. 1.

*NOTE—Decided July 17, and rehearing denied November 9, 1897.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

REVERSED.

*W. C. & J. C. Jones* and *Lee & McKeighan* for appellants.

(1) The court should have given the preliminary instruction offered at the close of plaintiff's testimony and given at the close of the case. The evidence showed without contradiction that the loss and damage occurred through the act of God, namely, the unprecedented flood shown in evidence, and there was no substantial evidence to show or to justify the jury in finding that the plaintiff was guilty of any negligence. When it is shown that a loss or damage to goods has been caused by reason of the act of God, as in the case of a flood or storm, or other unavoidable casualty, the defendant is excused unless plaintiff shows that the defendant was guilty of negligence proximately and immediately contributing to the loss, in such manner as to show that a loss would not have occurred but for the defendant's negligence. *Davis v. Railroad*, 89 Mo. 340; *Reeves v. Railroad*, 10 Wall. 189; *Morrison v. Davis*, 20 Pa. St. 171; *Railroad v. School Dist.*, 96 Pa. St. 65; *Henry v. Railroad*, 76 Mo. 294; *Milling Co. v. White Line*, 122 Mo. 258; *Witting v. Railroad*, 101 Mo. 631; *Otis Co. v. Railroad*, 112 Mo. 622; *Turner v. Haar*, 114 Mo. 347; *McPherson v. Railroad*, 97 Mo. 253; *Stoher v. Railroad*, 105 Mo. 192; *Cummings v. Mastin*, 43 Mo. App. 558; *McCarthy v. Wolfe*, 40 Mo. 520; *Withers v. Railroad*, 3 Hurl. & N. 969. (2) The doctrine applied to warehousemen. *Gashweiler v. Railroad*, 83 Mo. 112; *Buddy v. Railroad*, 20 Mo. App. 206; *State v. Meagher*, 44 Mo. 356; *Ducker v. Barnett*, 5 Mo.

97. (3) Bailees are not responsible for loss occasioned by overpowering force. *McEvers v. Steamboat*, 22 Mo. 187.

*Lubke & Muench* for respondent.

(1) A warehouseman is responsible for loss, or destruction of, or for injury to, property intrusted to his keeping, when he has failed to exercise due and ordinary care in the custody of the property. What constitutes such care is always a question for determination by the triers of the facts, in view of all surrounding circumstances, judging the same by the degree of care ordinarily exercised by other persons similarly situated; and direct and positive evidence of such negligence is not required. 28 Am. and Eng. Ency. of Law, p. 642; *Nichols v. Smith*, 115 Mass. 332; *Walden v. Finch*, 70 Pa. St. 464; *Holtzclaw v. Duff*, 27 Mo. 395; *Moulton v. Sheldon*, 10 R. I. 218; *Wilson v. Railroad*, 62 Cal. 164. (2) The intervention of irresistible force, whether of human or divine agency, does not excuse the hired bailee, whose wrongful connivance, or culpable exposure, or breach of contract, or remissness of duty in any respect, whether for preventing the calamity or lessening its injurious effects, proves to have proximately occasioned the mischief. Schouler on Bail. & Car. [2 Ed.], sec. 101; *Merch. Trans. Co. v. Story*, 50 Md. 4; *Pruitt v. Railroad*, 62 Mo. 527; *Ellet v. Railroad*, 76 Mo. 536.

BURGESS, J.—This action was brought by plaintiff, a brewing company, against defendants, warehousemen, to recover the value of three thousand, three hundred and eighty-seven bushels of malt delivered by plaintiff to defendants, and which they failed to deliver upon demand; and also damage to four thousand,

four hundred and forty-one bushels which were delivered by plaintiff to them, and which they returned to plaintiff in a damaged condition.

Plaintiff, who was at the time engaged in the brewing business in the city of St. Louis, stored a large quantity of malt with the defendants, who were warehousemen, and doing business as such in what was known as the Nedderhurt warehouse, on Main and Cedar streets, in the city of St. Louis, Missouri. The warehouses consisted of two connected buildings standing east and west. The one on the south was one story high, and known as Warehouse B. The one on the north was three stories high, and known as Warehouse A. The only connection between the two buildings is by a doorway on the first floor. The buildings were erected some twelve years before as a pork packing establishment, but had for six years at least been used for general storage.

During February and up to March 17, 1892, defendants received from plaintiff for storage one hundred and thirty-four loads of malt, all of which was stored in Warehouse A, where it remained until the eighteenth or nineteenth day of May, 1892, when the building sank, and a large part of the malt was returned to plaintiff in good condition, some of it damaged by water, some of it so badly damaged as to be worthless, this part of it being abandoned by plaintiff.

The manner of the collapse was by the breaking and giving way of the concrete foundations under the pillars upon which rested the central weight of the building, thus driving or sinking three of the pillars next to the south wall near the eastern center of the building into the ground and completely out of sight, and two of the pillars in the next tier north into the ground two or three feet. The timbers did not break, nor did the walls of the building give way.

The soil upon which the warehouse was erected was made by accretions, was sandy, and softened when brought in contact with water. Leschen, one of the defendants, knew what the soil was, and that it was sand and loam mixed with accretions. It was shown by the evidence that this sort of soil affords a good foundation when dry, but very bad when permeated by water. During the early party of May the water in the Mississippi river began to rise, and continued to rise a few inches each day until May 19, when the highest stage of water known at St. Louis was reached. Witnesses differed as to the probable weight contained in the building, as well also as to the carrying capacity of the first, second, and third floors, but as it is clear from the evidence that the collapse was not caused by overloading, the difference is not material. On Saturday or Sunday, the fourteenth or fifteenth of May, water from the sewer, which was backed up by the high stage of water in the river into which it empties, began to flow into the cellar of Warehouse B, through the sewer opening connecting that cellar with the street sewer. On Monday, May 16, fearing the water might get into the cellar of Warehouse A and wet the cement and other articles stored there, the defendants commenced moving goods out of that cellar. There was not a large quantity of goods in the cellar of Warehouse A, and they were all removed during the afternoon of Tuesday, May 17. In moving and caring for these goods the defendants employed eight men. These goods, mostly tobacco, rags and paper, were stored in different parts of the warehouse, the largest and heaviest part being on the horse-way, which extends from east to west through this warehouse. This horse-way is something like a bridge, is on a level with Main street at one end, and on a level with the alley at the other. It is three feet higher than the cellar floor and about

four feet lower than the first floor, and wide enough to permit the passage of grain wagons for which it was used. This driveway was supported by separate pillars, and no part of it was connected with the building or supported by anything that was any part of the building. The balance of the goods were distributed throughout the three floors wherever there was room to place them.

No water appeared in the cellar of Warehouse A until the forenoon of Tuesday, when it was discovered to be seeping through the wall of the building on the north, when defendants at once began moving the goods to an apparent place of safety from the water, and by 7 o'clock that evening had them all moved. About 8 o'clock on Wednesday morning, May 18, one of defendants' employees discovered that the first floor was not on a level, and that the floors were being gradually separated from the walls of the building to which they were attached. He immediately notified defendants' superintendent and the defendant Talbot of the condition of the floors. It was then too late to remove the goods from the building, and at twenty minutes to 9 o'clock on the next morning the pillars sank, the floors went down and a large part of plaintiff's malt went into the cellar and into the water. Plaintiff was immediately notified, and moved such of the malt as was worth moving.

Defendants knew that the water was gradually rising for ten days or more before the collapse, and for at least four days before knew that the water was at a level with the bottom of the warehouse cellar, but did nothing with the goods except to move them onto the first, second and third floors. Defendant Talbot testified that "with time enough, and men enough, we might be able to move what was in the building in a

day or two." Miller, defendants' bookkeeper, testified: "There would have been no trouble to unload the building by turning the grain into wagons, if I had thought there was any danger."

Plaintiff recovered judgment for $4,448.30, from which defendants appeal. At the close of plaintiff's evidence and again at the close of all the evidence, defendants asked an instruction in the nature of a demurrer thereto, which was refused by the court, to which ruling defendants duly excepted. It is insisted by defendants that the evidence showed that the loss and damage were occasioned by the act of God, namely, the unprecedented flood, and as it was not shown that they were guilty of any negligence contributing to the loss and damage, that the instruction should have been given.

The testimony in the case shows one of the most extraordinary stages of water in the Mississippi river ever known in the city of St. Louis, characterized by Mr. Kochler, president of the plaintiff, and who testified in its behalf as "phenominal." That about four days before the pillars gave way and the floor sank, the water was at a level with the bottom of the warehouse cellars, and on Tuesday morning before the collapse on Thursday, it was coming in through the wall on the north and other places, and as a result softening the sandy loam under the pillars, which caused them to sink, and the floors to give way, precipitating the malt into the mud and water. The warehouse was not overloaded and the collapse could not under the evidence be attributed to any other cause than the unprecedented high stage of water, and was what is known in law as the act of God.

The collapse being caused by reason of the act of God, defendants can not be held to respond for the value of the malt received by them from plaintiff in

storage, which they failed to return on demand, nor for damages to any of the malt received in the same way, and which was redelivered to plaintiff in a damaged condition, unless it appears from the evidence that the defendants were guilty of negligence directly contributing to the loss or damage. *Davis v. Railroad,* 89 Mo. 340; *Reeves v. Railroad,* 10 Wall. 189; *Milling Co. v. White Line Co.,* 122 Mo. 258; *Turner v. Haar,* 114 Mo. 347.

The petition does not allege any negligence on the part of defendants, but alleges delivery of the goods to the defendants, and a failure to deliver on demand. Therefore, when plaintiff showed the delivery of the malt to defendants for storage under a contract with them for hire, and the failure by defendants to deliver on demand, it made out a *prima facie* case of negligence on the part of defendants; but when the defendants showed that the goods were lost and damaged by the act of God, the burden shifted to the plaintiff to establish that the loss or damage was due to the want of the exercise of ordinary diligence and care in taking care of, and in failing to remove, the malt to a place of safety before the collapse.

In *Lancaster Mills v. Merchants' Cotton Press Company et al.,* 89 Tenn. 1, it is said: "The rule, as we understand it, is that the burden of proof is upon the bailor to prove the contract and delivery of goods; then upon the bailee to show their loss and the manner of the loss. The burden then shifts to the bailor to establish that the loss was due to negligence." *Runyan v. Caldwell,* 7 Hump. 134. In *Wiser v. Chesley,* 53 Mo. 547; *Kincheloe v. Priest,* 89 Mo. 240; *Taussig v. Schields,* 26 Mo. App. 318; *Arnot v. Branconier,* 14 Mo. App. 431, exemption from liability by the bailee was not claimed upon the ground of the intervention of irresistible force, and those cases are in that respect dis-

tinguishable from the case at bar, and not in conflict with what has been said in this case.

From these observations it follows that defendants can not be held liable for the loss or damage to the malt in question unless it appears from the weight of the evidence that such loss or damage was occasioned by reason of their failure to exercise ordinary diligence and care in providing for the safety of the malt.

What constitutes such diligence and care is always a question to be determined by the triers of the facts, in view of the surrounding circumstances, when there is substantial evidence upon which to submit to them such an issue; but in the absence of such evidence, it becomes a question of law, to be determined by the court. The question is as to whether or not there was any substantial evidence tending to show that defendants failed to exercise ordinary diligence and care in the protection of the malt. It is argued by plaintiff that substantial evidence of the want of such diligence and care was afforded by the circumstances in evidence, to wit, defendants' knowledge of the unsafe condition of the ground upon which the warehouse was erected when being permeated by water, the accumulation of water in the cellar for two or three days before the collapse, the daily increase of the flood which was a warning to them of approaching danger, the taking of heavy goods out of the cellar of the warehouse and adding them to the weight which the building was then carrying, instead of removing a sufficient amount of the goods from the building to have prevented the sinking of the pillars. This argument has for its foundation or it has none at all, the accumulation of water in the cellar of the warehouse during the two or three days next preceding the collapse with the knowledge of defendants, and as a result the softening of the ground under the pillars and their sinking into

the ground. The sinking .of the pillars was unques-
tionably occasioned by the high stage of water in the
river, which found its way into the cellar, under the
pillars, and softened the ground under them, by reason
of which they sank and produced the collapse. It does
not appear that a similar occurence had ever before
taken place in that locality. Under each pillar the
ground had been excavated about two or three feet,
and the space filled with concrete from four and one
half to five feet square, and two feet thick; on this
concrete was a block of limestone capping, which was
about three feet square and not less than fourteen
inches thick. This foundation was good when the
ground was dry, but bad when wet. The building had
been used for a warehouse for five or six years, had on
a previous occasion carried more weight, and no indi-
cation of the sinking of the pillars had ever been
observed. No such high stage of water had ever been
known in that locality, consequently no bad results
therefrom to admonish defendants of approaching
danger by reason thereof. Then how could the de-
fendants be held responsible for not anticipating and
preparing for that which human sagacity could not
have anticipated unless we require under such circum-
stances a prescience, such as no human being can either
claim or be held responsible for not exercising?

Numerous authorities hold that it is not negligence
not to take precautionary measures to prevent an in-
jury which, if taken, would have prevented it, when
the injury could not reasonably have been anticipated
and would not, unless under exceptional circumstances,
have happened.

Ray, in his work on Negligence of Imposed Duties,
pages 133, 134, says: "Mischief which could by no
reasonable possibility have been foreseen, and which
no reasonable person would have anticipated, can not

be taken into account as a basis upon which to predicate a wrong. A reasonable man does not consult his imagination, but can be guided only by a reasonable estimate of probabilities. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what his reason and experience will enable him to forecast as probable, nor conduct, on a basis of bare chances, a business whose success is dependent upon his accuracy in forecasting the future. He will order his precaution by the measure of what appears likely in the usual course of things. The proper inquiry is not whether the accident might have been avoided if the one charged with negligence had anticipated its occurrence, but whether, taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence. The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor of any particular means which it may appear, after the accident, would have avoided it. The requirement is only to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident . . . . . . . The prudence and propriety of men's doings are not judged by the event, but by the circumstances under which they act. If they act with reasonable prudence and good judgment they are not to be made responsible because the event from causes which could not be foreseen nor reasonably anticipated had disappointed their expectations."

So in Webb's Pollock on Torts [Enlarged Am. Ed.], pages 45 and 46, it is said: "Now a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human

affairs could not be carried on at all.   The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible.   He will order his precaution by the measure of what appears likely in the known course of things.   This being the standard, it follows that if in a particular case (not being within certain special and more stringent rules) the harm complained of is not such as a reasonable man in the defendant's place should have foreseen as likely to happen, there is no wrong and no liability.   And the statement proposed, though not positively laid down, in *Greenland v. Chaplin*, 5 Ex. 248, namely, 'that a person is expected to anticipate and guard against all reasonable consequences, but that he is not, by the law of England, expected to anticipate and guard against that which no reasonable man would expect to occur,' appears to contain the only rule tenable on principle where the liability is founded solely on negligence. 'Mischief which could by no possibility have been foreseen, and which no reasonable person would have anticipated' may be the ground of legal compensation under some rule of exceptional severity, and such rules, for various reasons, exist; but under an ordinary rule of due care and caution it can not be taken into account.'' See, also, *Dougan v. Champlain Co.*, 56 N. Y. 1; *Hubbell v. Yonkers*, 104 N. Y. 434; *Nelson v. Railroad*, 30 Minn. 74; *Allison Mfg. Co. v. McCormick*, 12 Atl. Rep. 273; *Railroad v. Locke*, 14 N. E. Rep. 391; *Richards v. Rough*, 53 Mich. 212; *Sjogren v. Hall*, *Ib.* 274; *O'Malley v. Railroad*, 113 Mo. 319; Cooley on Torts, 91, *et seq.; Withers v. Railroad*, 27 L. J. Ex. 417; *Loftus v. Ferry Co.*, 84 N. Y. 455; *Cleveland v. Steamboat Co.*, 68 *Ib.* 306; *Sutton v. Railroad*, 66 *Ib.*

243; Bishop, Noncontract Law, secs. 182, 447; *Bishop v. Railroad*, 14 R. I. 314; *Wright v. Wilmington*, 92 N. C. 156.

When defendants became aware of the fact that water was accumulating in the cellar, they had no reason to expect the collapse, nor did they have until it was too late to move the goods from the building. The only danger at that time seemed to be the wetting of the goods, and damage to them in that way, and in order to prevent this they moved them from the cellar to other parts of the building in order to protect them, and in so doing acted with ordinary diligence and care. They did what seems to us an ordinarily prudent and cautious person would have done under the circumstances, which was all the law required.

It follows that the instruction asked by defendants at the close of all the evidence should have been given.

The judgment is reversed. GANTT, P. J., and SHERWOOD, J., concur.

### SEPARATE OPINION.

SHERWOOD, J.—In *Fuchs v. St. Louis*, 133 Mo. 168, the principle decided was, that where a sewer explodes in a city and thereby causes injury, that the city is responsible for negligence in not anticipating and preventing such injury, *although such an explosion had never been known to occur in a sewer before*. When the majority opinion was read in that case, two of my associates and myself protested against the principle announced therein as being a monstrous one, at war with reason, common sense and authority; and time being granted me, I prepared a dissenting opinion in which, as the organ of the minority, I endeavored to show, by a very large citation of authorities, and I think successfully, that the city was not responsible for

an injury which *could not reasonably have been antici-
pated,* and which would not unless in exceptional cir-
cumstances have happened; in short, that such in-
stances are assigned to the domain of *inevitable accident*
for which, *no one being negligent, no one is responsible.*
All in vain, however, was my endeavor, by summoning
a vast array of pertinent authorities, and they all utter
the same principle, to convince the majority that both
reason and precedent put the stamp of indignant dis-
approval on such a doctrine as they had declared; a
doctrine which finds *no support in a single adjudication!*
But my attempt to convince them was as futile and
resultless as have been numerous other dissenting
opinions which I have heretofore felt constrained to
file in this court.

The majority opinion was delivered and filed on
March 3, 1897. On the *same* day an opinion was de-
livered and filed in division number two of this court
in *Sullivan v. Railroad,* 133 Mo. 1, a case which was
pending for decision during the *very time* that the
*Fuchs* case was under consideration. But mark you!
In *Sullivan's* case precisely the *same principle* is enun-
ciated as that for which I contended in *Fuchs'* case.
Anyone can see this who can see through a ladder!

And now we have the present case, the opinion
delivered and filed on July 17 of the current year, which
in more direct terms indorses the principle announced
in the minority opinion in *Fuchs'* case, citing some ad-
ditional authorities; but still, without any hint or
intimation being given, either in *Sullivan's* case or the
present one, by the learned judge who concurred in the
majority opinion in the *Fuchs* case, and wrote the
opinion in *Sullivan's* case, that the opinion in the
*Fuchs* case should be overruled.

Now, *what* are the members of the legal profession
of this State to think? Is the *Fuchs* case to be regarded

as still the law, or are the two cases delivered in this division to be held as disapproving and repudiating the doctrine of the *Fuchs* case?

It seems to me to be indubitably due to the members of the bar of this State that there should be a direct and authoritative announcement on this question; and with nothing less than this, will they, or should they, rest content.