# Merchants Ice & Cold Storage Co. v. United Produce Co.

June 16, 1939.

Eugene Hubbard, Judge.

Crawford, Middleton, Milner & Seelbach and Malcolm Crawford for appellant.

Henry Bedinger and Frank E. Daugherty for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Reversing.

The appellee, United Produce Company, plaintiff

below, will be referred to herein as the plaintiff, and the appellant, Merchants Ice & Cold Storage Company, the defendant below, will be referred to as the defendant. The plaintiff in December, 1936, stored 760 bags of seed potatoes with defendant which operated a modern cold storage plant of ten stories equipped with three electric freight elevators located at Logan and Lampton Streets in Louisville, Kentucky. The defendant charged 10 cents per hundred pounds for storing these potatoes and the receipts issued by it to the plaintiff contained this provision, "all loss or damage to goods or property occasioned by * * * providential cause, at owner's risk." The potatoes in question were stored in a suitable room in defendant's basement and they were destroyed by the unprecedented flood in Louisville in January, 1937.

Plaintiff alleged in its petition the loss of the potatoes was due solely to the careless and negligent manner in which defendant stored and cared for them and sought to recover $2494, the value of the potatoes. The answer, after traversing the material allegations of the petition, pleaded affirmatively the provision in the receipts issued plaintiff that it was not liable for an act of providence and that it exercised all possible care to safely store and care for the potatoes, and that their loss was entirely beyond its control and was the direct and proximate result of a providential cause. A reply completed the issues and the trial resulted in a verdict for plaintiff of $1247.

The only question presented on this appeal is whether the court erred in overruling defendant's motion for a peremptory instruction. This necessitates a brief review of the evidence. The record shows the following uncontradicted facts: The Ohio River must rise between 43 feet and 44 feet before water will enter defendant's basement in which the potatoes were stored. Since records have been kept, the Ohio River reached a flood stage of 44 feet only on three occasions prior to the time it broke all records by rising to a height of 57.1 feet in January, 1937. In 1883 it reached a stage of 44.8 feet; in 1884, 46.7 feet; and in 1913, 44.9 feet. As we understand the testimony of Dr. Kendall, the meteorologist in charge of the United States Weather Bureau station at Louisville since 1920, when the Ohio River is at flood stage from 35 to 40 feet, any additional rise is usually slow and gradual, since the river is then extended over

such a large territory that it takes a tremendous amount of water to make any appreciable rise. On January 20, 1937, the gauge showed a stage of 35.9 feet and on the evening of that day Dr. Kendall gave out this bulletin which appeared in the newspapers on the following morning, Thursday, the 21st:

"From present indications, a crest of 38 to 39 feet may be expected at Louisville, Saturday. However, it is raining throughout the upper valley, and if this rain becomes heavy during the next 24 hours this estimate will be exceeded. The ultimate crest will depend upon the amount of rain. If the rainfall (during the next 24 hours) should be as heavy as it was Sunday and Monday, there is a probability of 42 feet upper gage at Louisville early next week."

Dr. Kendall further testified there was nothing published prior to January 21st, which would indicate the river would reach a stage of 43.8 feet by 1 A. M., January 22 (which is about the hour and stage of the river when the water first entered defendant's basement); that whether or not the river would continue to rise depended upon the amount of rainfall; and while a meteorologist can predict rain, the amount which will fall cannot be predicted. On Thursday, January 21st, 3.68 inches of rain fell in Louisville, and in the 24 hour period between 6 o'clock A. M. Thursday, January 21st, and 6 o'clock A. M. Friday, January 22d, the river rose from 39.1 feet to 45.4 feet, or 6.3 feet; and between 12:30 and 1 o'clock A. M. on Friday, January 22d, it entered defendant's basement through the windows and rapidly came into the warehouse.

Defendant had something like a million pounds of goods stored in this basement and around 7:30 A. M. Thursday, January 21st, it started removing these goods to the upper floors of its warehouse with its regular crew of seven men. Later the crew was increased to thirteen, and more men were added during the day until from forty-five to fifty-five men were at work, the maximum number who could work expeditiously at removing the goods from the basement. Had forty-five men been put at this work at 8 o'clock this Thursday morning, they could have completed the job in about ten hours, and all goods would have been saved as there was sufficient room for storage in the upper stories of the ware-

house. Defendant's officers and agents testified that this maximum force was not put to work on Thursday morning as they were of the opinion from the bulletin issued by the United States Weather Bureau the river would not reach a stage sufficient to flood the warehouse. But as a stage of 42 feet had been predicted for the forepart of the following week in the event excessive rains continued, they started removing the goods at 7:30 Thursday morning, with a small force to prepare for this contingency. When they saw the waters were rising due to the tremendous downpour of rain, they increased the force as the waters rose, until they had all the men working that they had room for. The men continued to work until about 12:30 A. M. January 22d, at which time the water entered the basement; that to expedite the removal of these goods they put some of the potatoes on the first floor above the basement, and the flood so far exceeded predictions that it ruined the potatoes carried there.

We find the rule in this character of case to be that a warehouseman is not responsible for loss resulting from an act of God, but that such a plea will not benefit him where he is warned of the approaching calamity and fails to use ordinary care to protect the goods or to remove them to a place of safety. Ordinary care in such instances means that degree of care which men of ordinary prudence would exercise in caring for their own property under similar circumstances, or it is that degree of care which it may reasonably be expected that faithful and experienced warehousemen are accustomed to exercise with regard to similar goods in the performance of their duties under like circumstances. 67 C. J. 496, Sections 84, 85; Powell Music Company v. Parkersburg Transfer & Storage Company, 75 W. Va. 659, 84 S. E. 563. In the early stages of a flood where it may be reasonably anticipated no danger will occur, it is not negligence on the part of the warehouseman in failing to remove the goods. 27 R. C. L. 993, Section 52. But where the danger does not come unannounced and where warning and notice are given of its approach and the warehouseman has ample time and opportunity to save the goods by the use of ordinary care, he will be liable for their loss or damage. Merchants & Miners' Transportation Company v. Story, 50 Md. 4, 33 Am. Rep. 293.

Applying the above rule to the facts in this case we can ascertain if there was any evidence of negligence

on the part of defendant upon which the case might be submitted to the jury. The river reached flood stage on January 16th, when it registered 29 feet on the gauge of the United States Weather Bureau; and on the 17th, it was 30 feet; the 18th, 30.8 feet; the 19th, 33.5 feet; the 20th, 35.9 feet; and the 21st, 39.1 feet. From these figures it is seen the rise had been gradual from the 16th to the 21st. During the earlier stages of a flood a river rises more rapidly and during the five days interim from January 16th to the 21st, the rise was 10.1 feet, and the most the river had risen in any twenty-four hour period was 3.2 feet from January 20th to January 21st. On the morning of January 21st, at 7:30 defendant started moving the goods from its basement. The United States Weather Bureau bulletin of January 20th was published in the morning newspapers on January 21st, and stated that a crest of 38 to 39 feet was expected the following Saturday with a probability of 42 feet "early next week" if the rainfall should be as heavy as it was Sunday and Monday. The expert advice of the United States Weather Bureau was that the river would not reach a stage of 39 feet until Saturday, and this would lack reaching defendant's basement by 4 or 5 feet; if it reached a stage of 42 feet "early next week" by reason of the heavy rains continuing, still the river would lack reaching the defendant's basement by 1 or 2 feet. Instead of defendant having warning and notice of the unprecedented rise of 6.3 feet from January 21st to January 22d, in a river that was then at the extreme high stage of 39.1 feet, it had what is generally regarded as expert information given out by the United States Weather Bureau that there would be no rise above 39 feet, and that figure was three days off, and under the most unfavorable conditions the rise would not exceed 42 feet "early next week." After the meteorologist, who had twenty-seven years' experience with the United State Weather Bureau, on January 20th predicted in effect that the defendant's warehouse would be safe by 5 feet until Saturday, there could have been no negligence on the part of defendant in following this prediction and assuming that the goods in its basement would be safe until the early part of the following week. But out of precaution defendant started removing the goods from its basement on Thursday morning, January 21st, and as the waters rose it increased its force to keep ahead of them. It has been held in American Brewing Ass'n v. Talbot, 141 Mo. 674, 42 S. W. 679, 64 Am. St.

Rep. 538, and in Benedict Warehouse & Transfer Company v. McKannon Piano Company, 62 Colo. 180, 161 P. 145, that the prudence of men's actions is measured by the circumstances under which they act and not by the event which caused them to act; if they act with reasonable judgment, they are not liable because the event has exceeded their expectations due to causes that could not be foreseen or reasonably anticipated. Men are not called upon to guard against every risk that they may conceive as possible but only against what they can forecast as probable. Of course, the defendant knew it was possible for this flood to reach its warehouse before the following week, but it was justified in not believing it was probable it would do so, because the meteorologist of the United States Weather Bureau had published his prediction to that effect.

If we test defendant's action by what the ordinarily careful and prudent person would do under the same circumstances, we find it on a par with the actions of the average person residing in Louisville during this flood. Thousands of individuals, as well as business concerns, similarly situated as defendant lost their personal property by reason of this flood because they could not reasonably anticipate the water would reach the heights that it did, and during the sudden rise of 6.3 feet from January 21st to January 22d, they did not have time to remove their property to safety. Therefore, it cannot be said with reason that defendant did not exercise ordinary care when its action was that of the ordinarily careful and prudent person residing in Louisville during this flood. The situation existing in Louisville at that time is analogous to that which existed in Chattanooga in March, 1867, described in Memphis & C. Railroad Co. v. Reeves, 77 U. S. 176, 10 Wall. 176, 19 L. Ed. 909, where the United States Supreme Court found the railroad company was guilty of no negligence. We conclude from reading that opinion the railroad company followed the course of the ordinarily prudent citizen during that emergency.

We find there is no evidence in this record upon which men of ordinary judgment might reach a different conclusion as to whether the defendant was negligent in not starting to remove goods from its basement before the morning of January 21st, and as to whether defendant was negligent in the manner in which it proceeded to remove its goods until its basement was flooded. Hence

it became a matter of law whether or not defendant was negligent, and as the evidence shows defendant used that degree of care exercised by ordinarily careful and prudent persons under the same conditions, the court should have instructed the jury to find for the defendant. While the question of negligence is usually one for the jury, yet where there is not contrariety in the facts and but one reasonable conclusion can be drawn therefrom by ordinarily intelligent men, the question of negligence is one for the court and not for the jury. This rule is peculiarly applicable to a case of bailment. Barrett v. Ivison, 248 Ky. 243, 57 S. W. (2d) 1005.

The evidence fails to show any negligence on the part of defendant in not starting to remove the goods from its basement before 7:30 o'clock on the morning of January 21st; also, the evidence fails to show any negligence by defendant in the manner in which it proceeded to remove the goods after it started to do so until the basement was flooded; therefore, the case should not have been submitted to the jury. The judgment is reversed for proceedings consistent with this opinion.