## HUNTER PACKING CO.
### v.
## BALTIMORE & O. R. CO.
### No. 10855.

United States Court of Appeals
Seventh Circuit.
Feb. 12, 1954.

Rehearing Denied March 16, 1954.

Rudolph J. Kramer, R. Emmett Costello, John C. Roberts, East St. Louis, Ill., John M. Aherne, New York City, John L. Conners, New York City, Kramer, Campbell, Costello & Weichert, East St. Louis, Ill., Bigham, Englar, Jones & Houston, New York City, Edwin H. Burgess and F. W. Doolittle, Jr., Baltimore, Md., of counsel, for appellant.

Henry Driemeyer, Robert L. Broderick, East St. Louis, Ill., Pope & Driemeyer, East St. Louis, Ill., of counsel, for appellee.

Before MAJOR, Chief Judge, and DUFFY and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiff brought this action to recover damages which it sustained when two shipments of perishable meat products owned by plaintiff and transported by defendant as a common carrier for hire were inundated in a flood at Smithburg, West Virginia. The meat products were shipped from East St. Louis, Illinois, for delivery to consignees in Philadelphia, Pa., and Washington, D. C. The bills of lading each contained a provision that defendant would not be liable for any loss caused by an act of God.

There was no denial that while being transported in one of defendant's trains on its railroad near the village of Smithburg, West Virginia, certain of plain-

tiff's meat products were damaged, but defendant alleged that the loss was caused by an unexpected flood of unprecedented violence amounting to an act of God. The trial was to a jury which rendered a verdict favorable to plaintiff, and assessed damages at $21,972.67.

Defendant assigns as error the trial court's denial of its motion for a directed verdict and that it overruled its motion for judgment notwithstanding the verdict. Error is also assigned as to the admission of evidence, instructions to the jury, and because the trial court denied defendant's motion to transfer this case from the District Court for the Eastern District of Illinois to the District Court for the Northern District of West Virginia.

In the vicinity of Smithburg, W. Va., defendant's tracks run east and west, and lie in a valley surrounded by hills to the north and south. The Smithburg station is south of and adjacent to the tracks. About 3,200 ft. east of the station Buckeye Creek and Meathouse Fork converge, to form Middle Island Creek, their confluence being within a few feet of the railroad tracks and about 1,090 ft. west of Railway Bridge No. 20. This bridge is 4,291 ft. east of the Smithburg station while Bridge No. 21 is 3,003 ft. west of the station. U. S. Highway No. 50 is located a short distance north of, and lies substantially parallel to, the railroad tracks.

Middle Island Creek runs roughly parallel to the railroad tracks and Highway No. 50. At a point opposite the Smithburg station the distance from the south rail of the tracks to the north bank of the creek is 263 ft. The grade is downward from the tracks. The top of the rail at the station is 26.6 ft. higher than the usual water level in the creek. The floor of a refrigerator car of the type used to transport plaintiff's shipments is 39 inches higher than the top of the rail.

Parkersburg, W. Va., is the western terminus of defendant's Monongah Division. Smithburg is located about 56 miles east of Parkersburg. On the night of June 24, 1950, Train No. 94 was made up at Parkersburg and departed eastward at 9:05 P.M. It was in charge of an experienced crew of 7 men who were familiar with the stretch of track over which they were to travel. The train was made up of 58 cars and a caboose, a front locomotive, and a rear or pusher locomotive, and its overall length was about 2,800 ft. Plaintiff's shipments were in two refrigerator cars, about three or four cars back from the front locomotive.

There is some dispute in the record as to whether any rain was falling when the train left Parkersburg, although the weather bureau records there indicate that between 5:00 P.M. and midnight 0.17 of an inch of rain fell. The weather bureau had predicted for that area, "Scattered afternoon or evening thundershowers." However, at Smithburg rain had started falling about 7:00 P.M. and continued with ever-increasing intensity until about midnight. Thereafter heavy rains continued into the early morning hours of June 25.

Train No. 94 ran into water conditions at the west end of Tunnel No. 6, which is located 5 miles west of Smithburg station. Water was then coming off the hills and washing onto the track. The engineer proceeded cautiously, and, coming out of the east portal of the tunnel, the train struck earth or rocks, but continued its journey until it stopped for water at Rock Run Pumping Station about 1½ miles west of Smithburg. The conductor attempted to telephone the Smithburg operator to report conditions encountered at Tunnel No. 6, but was unable to get a message through because of the storm. After both locomotives had been rewatered, the train resumed its journey. At the west side of Bridge No. 21 it ran through an accumulation of mud and rock and into a dip in the track. The front engine lurched as though the ballast had been washed out. The pilot of the front locomotive was bent so that it dragged on the tracks, emitting sparks. The train

continued across Bridge No. 21 and through Tunnel No. 5, and stopped with the head locomotive about opposite the Smithburg station. Part of the long train was thus in Tunnel No. 5, and the last four cars were on the tracks west thereof. After the train stopped, the flagman discovered that tracks extending 150 to 200 ft. west of Bridge No. 21 were at places washed out, with nothing holding the ties but the rails. He had gone back across Bridge No. 21 to flag passenger Train No. 2, but when he saw haystacks and small buildings floating down Middle Island Creek, he went back to the east side of the bridge for his own safety and so that he would not be cut off from the train. Between 1:00 and 1:30 A.M. the rear crew saw at least two houses float down Middle Island Creek and strike against Bridge No. 21. One house had a man on its roof and the other had several people in it.

After the engine halted opposite the station, it was uncoupled from the train and it was then ascertained that the pilot or cow catcher would not clear a grade crossing east of the station. The forward crew then started to make repairs and completed them about midnight. The conductor reported the completion of repairs to the operator, but the tracks had been taken out of service by orders of the defendant's Safety Division. The Smithburg operator put out a stop signal to prevent the train from moving and told the conductor the train was to stay at Smithburg until information could be obtained as to the condition of the tracks to the east. About this time a landslide was reported at Tunnel No. 4, located about four miles east of Smithburg.

While the repairs to the cow catcher were under way, it was discovered that back about ten cars from the front of the train, and at a point opposite the Davis home, brush and other debris were washing onto the tracks, and under the train, from the hill to the north. Before midnight it was discovered that the tracks opposite the Bond home, which was a short distance west of the station, were found to be washed out between the ties, leaving large holes. At 11:35 P.M. water from Middle Island Creek was several inches over the floor of a building to the southwest of the station. The nearest railroad tracks were from 7 ft. to 8 ft. higher than the floor of this building.

Shortly after 1:00 A.M. the waters rose above the level of the tracks. Between 1:50 A.M. and 2:25 A.M. Meathouse Fork went out of its banks and rushed into Middle Island Creek from the east. This movement was described as a "wall of water" and a "big swirl" and caused great damage. The water continued to rise, reaching its crest about 4:00 A.M. Both the forward and rear crews had climbed on top of their respective locomotive boilers, as places of safety. Near the station the water rose above the tracks to a height estimated to be two-thirds of the height of a railroad car, and rose 8 ft. to 9 ft. in the station. It was established that on the head engine the waters rose 9 ft. 4 inches, extinguishing the fires under the boiler. The flood waters reached a higher level on the cars toward the front of the train than on those in the rear. On the rear locomotive the water reached 44 inches above the rails.

This was the most severe flood in the history of Smithburg. Eighteen out of the 300 inhabitants were drowned. Houses, stores, and other buildings were torn from their foundations and wrecked. Shortly after the wall of water from Meathouse Fork struck, a two-story building was washed onto the tracks just a short distance in front of the forward locomotive of Train No. 94. The last flood of any serious proportions was in 1888 and the waters on June 24-25, 1950, rose 10 ft. to 15 ft. higher than in the 1888 flood. At no previous times had flood waters ever reached the railroad tracks. After the water in the creeks showed evidence of flooding, a number of the residents of Smithburg left their homes and took their families up to the railroad tracks, describing it as "up to safety."

The trial court ruled, and so instructed the jury, that the unexpected flood conditions were an act of God. The case was submitted to the jury, however, on the issue of whether defendant and its employees were guilty of negligence which concurred with this act of God as a proximate cause of the damage to the meat products.

Plaintiff's argument is that defendant's officials and employees should have realized that a flood was impending at Smithburg and should have kept Train No. 94 at Rock Run, which is at a higher elevation, and which proved later to have been free from flood waters; that after the train was at Smithburg plaintiff's employees permitted it to remain there for more than three hours until it was inundated; that they did not move the train or attempt to do so although they had knowledge that safe ground lay less than two train lengths (slightly over one mile) to the east, and also ten minutes running time to the west. Plaintiff argues that the train crew well knew that the tracks east of Smithburg are upgrade from the station, and commencing from a point east of Bridge No. 20, about a mile from the station, that there was a certain stretch of track more than 1½ miles in length which was at a higher elevation than the track at Smithburg station. It later developed that this stretch of track was untouched by flood waters. Plaintiff says that had Train No. 94 been moved to *any* stretch of track long enough for Train No. 94 and six ft. higher than the track at the station, no water would have entered the refrigerator cars.

It is clear to us that there was no negligence on the part of defendant's employees in permitting the train to depart from Rock Run. Although it had started raining at Smithburg at 7:00 P. M., only 1.02 inches had fallen by 9:00 P.M. During the next two hours 3.13 inches of rain fell, but the creeks stayed within their banks. While surface water in considerable quantities was draining from the hills to the creeks, and in some places running across the tracks, that happened, due to the topography of the area, every time it rained heavily in Smithburg. One of defendant's passenger trains had passed through Smithburg about 10:00 P.M. and continued to the east. At 11:00 P.M. when Train No. 94 made its unscheduled stop at Smithburg, Middle Island Creek was still within its banks. The north bank of that creek was 263 ft. from the tracks, and the difference in elevation between the normal water level of the creek and the rails was 26.6 ft. In considering whether defendant's officials or employees were negligent in any respect, it should be kept in mind that never in the memory of any living witness had flood waters previously reached defendant's tracks at Smithburg.

It was necessary to stop the train at Smithburg to repair the damage to the cow catcher. The train could not have proceeded further without such repairs being made. We do not understand that plaintiff claims that the stop for repairs constituted negligence. The repairs were completed about midnight. By that time considerable debris had been washed on the tracks, but assuming any such debris could have been removed, we think that no negligence was shown because the crew failed to reverse the direction of the train, and proceed to the vicinity of Rock Run.

Putting aside for the moment the question of whether the train crew had any duty or even authority to move the train contrary to stop orders, a rearward movement would have necessitated the entire train backing over Bridge No. 21. The rear crew knew that buildings and other debris had struck and been piling up against this bridge. At least one of the crew, the flagman, knew that the west approach to the bridge had been badly washed and weakened. A train movement over this bridge at any time after midnight would have been extremely hazardous and would have greatly endangered the crews riding in the caboose and in the rear locomotive. From the evidence in this record it is impossible to conceive that Train No. 94

could have safely passed back over the west approach of Bridge No. 21.

As to proceeding in a forward or easterly direction, it is true that east of Bridge No. 20 there was a stretch of track that flood waters did not reach, and had Train No. 94 been pulled up to such location, it follows that plaintiff's meat products would not have been damaged. But the actions of defendant's employees must not be judged by hindsight, for, without any fault of theirs, they found themselves in an emergency situation. The test must be: Were they in the exercise of ordinary care, skill and foresight for the safety of plaintiff's property?

The condition of Bridge No. 20 after midnight is not as clear as to the situation at Bridge No. 21. In spite of all the adverse conditions, the evidence shows that after the cow catcher was repaired, the train crew was willing to proceed easterly, but as the train was about to proceed, the stop order was received. The train crew had no authority to disregard such order.[1] It, therefore, must be the plaintiff's contention that the issuance of the stop order which kept Train No. 94 standing at Smithburg was negligence.

The Supervisor of Maintenance, after receiving various reports as to the flooded condition of tracks, bridges, and tunnels, decided that Train No. 94 should be held at Smithburg. He had reports that there was high water on the tracks 2½ miles east of Smithburg; that a landslide blocked entrance into the west portal of Tunnel No. 4, about 3.87 miles east of Smithburg; and that flood water was over the bridge near Long Run, 5.26 miles east of Smithburg. It was the Supervisor's responsibility to make a decision. Had he later changed such decision, a new order could not have been transmitted until later when wire services were put back in operation, as the last order received at Smithburg was the stop order for Train No. 94. Shortly thereafter all communications, including block signals, had been cut off by the storm. Under the circumstances, the train crew was under no duty to violate their orders, and to ignore the probability of encountering dangers similar to those they had experienced to the west of their location, by risking their train on the tracks and bridges, and in the tunnels, lying ahead, and to subject the train and its crew to the unknown hazards of proceeding eastward. We hold that there is no substantial evidence to support a finding that defendant's employees were guilty of negligence in issuing the stop order, or in failing to move the train eastward after the stop order was received.

A number of courts have passed upon the contention that employees of a railroad were negligent when confronted with an emergency resulting from unexpected flood conditions. Each case of course must stand on its own facts, and the situation and conditions involved with various floods are different. However, a citation of several such authorities indicates that our conclusion that defendant's employees were not negligent is in accord with the prevailing view.

In Farr Co. v. Union Pac. R. Co., 10 Cir., 106 F.2d 437, plaintiff sued for the value of a car of beans destroyed in a flood. The carrier had knowledge of heavy rains and flood conditions near the Ohio River in Kentucky for several days before plaintiff's shipment was inundated. Weather bureau forecasts warned people to prepare for a flood stage approximately the same as in a certain previous flood. However, the flood wa-

1. Standard Code of Operating Rules of Assn. of American Railroads: "204. Orders addressed to operators restricting the movement of trains must be respected by conductors and enginemen the same as if addressed to them." In addition, the Standard Code of Block Signal and Interlocking Rules of Assn. of American Railroads provides: "509. When a train is stopped by a Stop-indication it must stay until authorized to proceed * * *."

ters exceeded even the most severe flood (1884) experienced in Louisville. The car of beans was the only one left standing in the railroad yards. Plaintiff urged that a jury question was presented. The trial court directed a verdict for the defendant, and the Court of Appeals for the Tenth Circuit affirmed, saying, 106 F.2d at page 439: "The test to be applied is not the hindsight test, but the foresight test. The question is: Could the railroad company reasonably have anticipated the damage would be caused by such Act of God?"

In Standard Brands, Inc. v. Boston & M. R. R., D.C., 29 F.Supp. 593, the plaintiff claimed that the carrier's yardmasters were negligent in failing to anticipate the flood conditions. It was shown that the height of the flood waters was unprecedented. The court pointed out that in federal courts, if it is shown that the loss was occasioned by an excepted clause of the bill of lading such as an act of God, then plaintiff assumes the burden of proving that the carrier was negligent and that such negligence directly and proximately contributed to the result, citing Memphis & C. Railroad Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909, and other cases. The court held that plaintiff had not met the burden of proving defendant could have avoided the consequences by adopting reasonable preventive measures.

In Wertheimer, Swartz Shoe Co. v. Missouri Pac. Ry. Co., 147 Mo.App. 489, 126 S.W. 793, the flood was unprecedented. Weather reports had failed to predict the flood waters would reach the height which they did. The court held that the defendant's motion for a directed verdict should have been granted. See also: Merchants Ice & Coal Storage Co. v. United Produce Co., 279 Ky. 519, 131 S.W.2d 469.

We hold that there was no substantial evidence as a basis for a finding that the employees of the defendant railway were negligent, and that such negligence proximately caused the damage to plaintiff's products. Therefore, the trial court should have directed a verdict for the defendant.

We do not reach the other points raised by appellant.

Reversed.